**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**MacMILLAN RING–FREE OIL CO., Inc.,
Respondent.**

**No. 21902.**

United States Court of Appeals
Ninth Circuit.

April 10, 1968.

B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Board, Washington, D. C., for petitioner.

Willard Z. Carr, Jr. (argued), Kenneth E. Ristau, Jr., of Gibson, Dunn & Crutcher, Los Angeles, Cal., for respondent.

Before BARNES, HAMLEY and KOELSCH, Circuit Judges.

BARNES, Circuit Judge:

The National Labor Relations Board herein petitions under section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e) (1964), for enforcement of an order issued by the Board on September 2, 1966, against the MacMillan Ring-Free Oil Company, Inc.

The Board's decision and order, reported at 160 N.L.R.B. No. 70, included findings that (1) the company had violated subsections 8(a) (1) and (3) of the Act, 29 U.S.C. § 158(a) (1), (3) (1964),[1] by withholding the vacation pay of four employees because they were on strike, thereby discriminating against them for engaging in union activity; (2) the company also had violated subsections 8(a) (1) and (5) of the Act, 29 U.S.C. § 158 (a) (1), (5) (1964),[2] by failing to negotiate in good faith with the certified bargaining representative of its production and maintenance employees, the Oil, Chemical and Atomic Workers Interna-

Leonard M. Wagman (argued), Elliott Moore, Edward E. Wall, Attys., N. L. R.

1. "§ 158. Unfair labor practices.
"(a) It shall be an unfair labor practice for an employer—
"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [section 7 of the Act];
" * * *
"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."
Section 7 of the Act, 29 U.S.C. § 157 (1964), provides as follows:
"§ 157. Right of employees as to organization, collective bargaining, etc.
"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *."

2. "(a) It shall be an unfair labor practice for an employer—
" * * *
"(5) to refuse to bargain collectively with the representatives of his employees * * *."
It is undisputed that the existence of a section 8(a) (1) violation in this respect depends entirely upon the commission of an unfair labor practice under section 8(a) (5).

tional Union, AFL-CIO;[3] and (3) a strike beginning on September 8, 1964, had been caused and prolonged by the company's improper refusal to bargain. Accordingly, the Board ordered the company to cease and desist from the unfair labor practices found and from interfering in any other manner with its employees' rights under section 7 of the Act, 29 U.S.C. § 157 (1964). Reinstatement of all employees who had engaged in the strike referred to above was also ordered, as was posting of the usual notices announcing compliance with the Board's order.

## I. THE WITHHOLDING OF VACATION PAY

■ The Board's ruling with respect to the withholding of vacation pay on discriminatory grounds is not challenged here by the company, and therefore the portion of the Board's order which relates to that violation must be enforced.

## II. THE REFUSAL TO BARGAIN

MacMillan urges several objections to the Board's finding that it refused to bargain in good faith. Its primary contention, however, concerns the requirement of section 10(b) of the Act, 29 U.S.C. § 160(b) (1964), that

"no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made * * *."

### A. The Period Between May 10, 1964, and September 8, 1964

■■ Although the negotiations and other events bearing on the findings of the Board date back to 1960, the complaint involved here is based on a charge filed by the union on November 10, 1964. Thus the Board's finding of a refusal to bargain can apply literally only to the period following May 10, 1964, and the

conclusion that such a refusal occurred during that period must be supported by substantial evidence. Moreover, since the strike commencing on September 8, 1964, was found to be a result of such a refusal, similar support must exist for the conclusion that the prohibited conduct occurred prior to that date if the Board's order is to be enforced in toto.

■ It is uncontradicted that the company did very little between May 10 and September 8, 1964, which could conceivably constitute a refusal to bargain. The principal reason for this circumstance is that on May 7, 1964, the parties consented to postpone bargaining during the pendency of industry-wide negotiations; this postponement was agreed upon in order that the International and the majority of the industry might reach a settlement that could be used by the parties to measure their respective economic proposals. It is admitted by the Board that while negotiations were thus suspended the company did not improperly refuse to bargain.

Only on September 2, 1964, did MacMillan begin to engage in conduct which, if combined with a subjective intent to avoid reaching an agreement, might constitute a violation of section 8(a) (5). On that day the parties met and the company submitted what was termed its "final proposal"—a suggested contract that differed very little from those which it had previously submitted. In addition, when the union's representative indicated in response that a strike would be called unless agreement were reached within a week, the company's negotiator asked, "Haven't you had enough yet?" The trial examiner took this response to represent a suggestion that the company had thus far defeated the union's efforts to conclude an agreement and that continued efforts would lead only to "more of the same." There is no evidence of any other occurrence immediately prior to initiation of the September 8 strike

---

3. The International and Long Beach Local 1–128 cooperated in the bargaining effort here in question. Following the practice of the parties and the trial examiner, we will refer to both organizations collectively as "the union."

which could conceivably support the Board's finding of a refusal to bargain.

We have no hesitation in holding that, standing alone, the evidence just outlined is plainly insufficient to support the Board's conclusion that the company violated section 8(a) (5). Such violations depend essentially upon whether or not the party in question genuinely desires to reach an agreement, and the mere fact that MacMillan had not budged from its earlier position on most issues cannot (without substantial evidence that the company's attitude was inconsistent with its duty to seek an agreement) suffice to render it culpable.[4] See, e. g., NLRB v. Almeida Bus Lines, Inc., 333 F.2d 729, 731 (1st Cir. 1964). Furthermore, we have serious doubts concerning the significance of the remark made by the company's negotiator. That comment would seem at most to be ambiguous; the union had been involved in earlier strikes against MacMillan, whose representative may well have been asking whether the union had not "had enough" of the difficulties that inevitably accompany such economic action. Thus interpreted, the remark would seem a natural response to the sort of strike ultimatum which the union had just delivered. Under the trial examiner's interpretation, on the other hand, the comment seems somewhat out of context—as if the union had just extended, rather than drastically reduced, the time it was allowing the company before it would call a strike. That comment, then, is far too insubstantial a foundation for the Board's finding of a section 8(a) (5) violation.

### B. The "Strike Pay" Proposal of December 4, 1964

Nor does consideration of the company's proposal of December 4, 1964, yield support for that finding.

The portion of that proposal relied upon by the Board was a "strike pay" provision, which would have required the *union* to pay employees their full salary during any period in which they were on strike—a requirement which was to extend for a year after expiration of the proposed contract period. For our purposes the propriety of weighing this post-charge proposal in judging the company's motivation (even prior to September 8, 1964) may be conceded. See NLRB v. Fant Milling Co., 360 U.S. 301, 79 S.Ct. 1179, 3 L.Ed.2d 1243 (1959). We may also assume arguendo that in certain exceptional cases the extreme or bizarre character of a party's proposals may give rise to a persuasive inference that they were made only as a delaying tactic or that they should be viewed as a facade concealing an intention to avoid reaching any agreement. Such is the suggestion of NLRB v. Reed & Prince Mfg. Co., 205 F.2d 131, 139 (1st Cir.), cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953), and Vanderbilt Products, Inc. v. NLRB, 297 F.2d 833, 834 (2d Cir. 1961). We believe, however, that such a principle, if accepted at all, must be narrowly restricted. Otherwise, the policy supporting section 8(d)'s provision that the duty to bargain in good faith does not "require the making of a concession" would be impermissibly undermined.

That provision has been interpreted by the Supreme Court to require that

"the Board may not, either directly or indirectly, compel concessions or otherwise sit in judgment upon the substantive terms of collective bargaining agreements." NLRB v. American Nat. Ins. Co., 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027 (1952).

We do not believe that the circumstances here are so compelling that the thrust of this requirement can justifiably be avoided. In the *Reed & Prince* case, not merely a single proposal, but the entire contract insisted on by the employer was characterized by the court as one which the employer could not "with a straight face and in good faith" have considered

---

4. It may be noted that throughout the entire course of negotiations the union likewise remained adamant, refusing to retreat to any substantial extent from its original proposals on most issues.

acceptable to any "self-respecting union." 205 F.2d at 139. Moreover, several other evidentiary factors were fairly relied upon in that case as indicating the existence of a bargaining attitude impermissible under section 8(a) (5). And in the *Vanderbilt* case, the employer not only incorporated an extensive set of "terms which no 'self-respecting union' could brook" into its substantive proposal, but also "condition[ed] all negotiations upon the acceptance" of all such terms. 297 F.2d at 833. Here, the single provision in question, offered in response to initiation of the union's strike, was proposed once and "never 'referred to again by the Company'." C.T. 56. We do not feel that the approach of the *Reed & Prince* and *Vanderbilt* decisions can, consistently with the provision of section 8(d) referred to above, be extended to such circumstances. Hence, even considered along with the evidence previously recounted, the December 4 proposal clearly does not provide sufficient support for a finding that MacMillan refused to bargain at any time, either before or after September 8, 1964.

## C. The History of Negotiations Prior to May 10, 1964

The Board viewed the conduct thus far set out, however, "in light of" events which took place before May 10, 1964. And it may be conceded that the long history of the parties' negotiations, heavily relied upon by the Board, casts a certain amount of doubt on the good faith of the company. Three illustrative points may be referred to briefly in this regard.

First, the company moved with a pronounced lack of promptness in certain portions of the negotiations. The trial examiner found that at a December 13, 1963, meeting, the company's negotiator was asked if he was prepared to submit his "final proposal"; he stated that he was not, but that he would contact the union just after Christmas in order to arrange a meeting. Despite an inquiry by the union in March 1964, however, the company did not arrange to hold such a meeting until May 7, 1964, and then

only on the union's immediate initiative. The Board has ruled that the Act

"does not permit an employer to secure * * * a dominant position at the bargaining table by means of unreasonable delay." Burgie Vinegar Co., 71 N.L.R.B. 829, 830 (1946); cf. NLRB v. Mrs. Fay's Pies, 341 F.2d 489, 492 (9th Cir. 1965).

Second, in February 1964 the company unilaterally notified employees of a "grant" of increased vacation benefits almost identical to benefits proposed by the union in 1961 (and rejected at that time by MacMillan). Furthermore, the trial examiner found that the notification was intentionally made in a manner and using language calculated to raise doubts in the minds of employees as to whether the union was effectively representing them. Commenting on similar conduct in NLRB v. Generac Corp., 354 F.2d 625, 628 (1965), the Seventh Circuit quoted its opinion in Inland Lime & Stone Co. v. NLRB, 119 F.2d 20, 22 (1941), as follows:

"This action was more than merely tactless. It evidenced a wilful and deliberate contempt for the whole plan of collective bargaining. It was fairly inferable that the employer, by this action, intended to humiliate the Union representatives and discredit them in the eyes of their fellow employees. It reflected on the alleged good faith of [the employer's] recognition of the Union as a bargaining agent." See also NLRB v. Reed & Prince Mfg. Co., 205 F.2d 131, 139 (1st Cir.), cert. denied, 346 U.S. 887, 74 S.Ct. 1179, 3 L.Ed.2d 1243 (1953).

Third, the company's negotiators were found to be to some extent contradictory and evasive when responding to questions concerning the reasons for some of their more severe proposals. This reaction was taken by the trial examiner as at least some indication that MacMillan's motives in making certain of those proposals were inconsistent with the attitude required by section 8(a) (5).

"Good-faith bargaining necessarily requires that claims made by either bargainer should be honest claims." NLRB v. Truitt Mfg. Co., 351 U.S. 149, 152, 76 S.Ct. 753, 755, 100 L.Ed. 1027 (1956).

We may assume that these "background" factors, and some few others which we have not recited, considered together with the evidence. mentioned earlier, would provide a sufficient foundation for the Board's finding of a refusal to bargain. In view of the marked insubstantiality of that earlier-discussed evidence, however, it is plain that the principal support for that finding would necessarily come from the "background"—that is, from evidence antedating May 10, 1964. Hence we must determine whether primary reliance upon such evidence is consistent with the terms and policies of section 10(b) of the Act.

Section 10(b) has been characterized as "a statute of limitations, and not a rule of evidence." Local Lodge No. 1424, IAM v. NLRB, 362 U.S. 411, 415, 80 S.Ct. 822, 826, 4 L.Ed.2d 832 (1960). And literally, of course, the violation found by the Board "occurred" within the specified six-month period before the filing of the charge. The same considerations were thought insufficient by the Supreme Court, however, to determine in Local Lodge No. 1424, IAM v. NLRB, supra, an issue quite similar to that now presented to us.

In the *IAM* case, the question before the Court concerned the validity of a bargaining agreement under sections 7 and 8 of the Act. The Court stated that under those sections

"the Board has evolved the principle, not drawn into question here, that it is an unfair labor practice for an employer and a labor organization to enter into a collective bargaining agreement which contains a union security clause, if at the time of original execution the union does not represent a majority of the employees in the unit. The maintaining of such an agreement in force is a continuing violation of the Act, and the 'majority status' of the union at any subsequent date—including the date of execution of any renewals of the original agreement—is immaterial, for it is presumed that subsequent acquisition of a majority status is attributable to the earlier unlawful assistance received from the original agreement." 362 U.S. at 413–414, 80 S.Ct. at 824–825 (footnotes omitted).

In *IAM* the petitioners' action in allowing such an agreement to remain in force had been found by the Board to constitute an unfair labor practice under the above principle, on the sole ground that the union in question had represented only a minority of employees at the time the agreement was originally signed. The charge had been filed while the contract was in effect, but more than six months after the original signing.

In approaching the question of section 10(b)'s application, the Court stated that

"due regard for the purposes of § 10(b) requires that two different kinds of situations be distinguished. The first is one where occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices. There, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose § 10(b) ordinarily does not bar such evidentiary use of anterior events. The second situation is that where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice. There the use of the earlier unfair labor practice is not merely 'evidentiary,' since it does not simply lay bare a putative current unfair labor practice. Rather, it serves to cloak with illegality that which was otherwise lawful." 362 U.S. at 416–417, 80 S.Ct. at 826–827 (footnote omitted).

The Court held that the case before it fell within the second category and that the charge therefore was not timely filed:

> "Where, as here, a collective bargaining agreement and its enforcement are both perfectly lawful on the face of things, and an unfair labor practice cannot be made out except by reliance on the fact of the agreement's original unlawful execution, an event which, because of limitations, cannot itself be made the subject of an unfair labor practice complaint, we think that permitting resort to the principle that § 10(b) is not a rule of evidence, in order to convert what is otherwise legal into something illegal, would vitiate the policies underlying that section." 362 U.S. at 419, 80 S.Ct. at 828.

This holding is not directly in point (although the company charges that the Board is utilizing "background evidence" to "convert what is otherwise legal into something illegal"). For the case before us actually falls into neither of the two categories described above by the Court, but into another class which its opinion mentioned in passing:

> "Indeed, some Board cases have gone even further and held § 10(b) a bar in circumstances when, although none of the material elements of the charge in a timely complaint need necessarily be proved through reference to the barred period—so that utilization of evidence from that period is ostensibly only for the purpose of giving color to what is involved in the complaint— yet the evidence in fact marshalled from within the six-month period is not substantial, and the merit of the allegations in the complaint is shown largely by reliance on the earlier events. See, e. g., News Printing Co., 116 N.L.R.B. 210, 212 [1956]; Uni-

versal Oil Products Co., 108 N.L.R.B. 68 [1954]; Tennessee Knitting Mills, Inc., 88 N.L.R.B. 1103 [1950]." 362 U.S. at 421, 80 S.Ct. at 829.

The *IAM* opinion expressly refrained from passing judgment on the rule thus applied by the Board in the cases cited.[5] In resolving the conflict between that rule and the action of the Board in this case, we feel—although the question is not without difficulty—that the thrust of the Court's reasoning in *IAM* calls for endorsement of the News Printing-Universal Oil-Tennessee Knitting Mills doctrine, and we hold accordingly that the Board's finding of a refusal to bargain here is unjustified.

The *IAM* decision rested on an evaluation of the "policies underlying" section 10(b), which were described as follows:

> "to bar litigation over past events 'after records have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and confused,' H.R. Rep.No.245, 80th Cong., 1st Sess., p. 40, and of course to stabilize existing bargaining relationships." 362 U.S. at 419, 80 S.Ct. at 828 (footnote omitted).

Presumably the Court thought that the stabilization of existing bargaining relationships called for the validation of a recognition and negotiation arrangement which had been de facto operative for over six months. In a broader sense, however, it should be recognized that the stability of such relationships is hardly enhanced by the possibility that one party may dredge up events of years past, in the guise of "evidence" designed to "shed light" on more recent conduct, and base unfair labor practice charges primarily upon such bygone events. Furthermore, in spite of the characterization of section 10(b) as a "statute of limitations," we think that to allow

---

5. But cf. the somewhat puzzling comment, contained in a footnote to the Court's opinion, asserting that possible doubt as to the soundness of such decisions

> "does not impair the accuracy of the proposition that however marshalled,

*acts* within the limitations period must under Board doctrine yield some substantial evidence of unlawful conduct." 362 U.S. at 422 n.13, 80 S.Ct. at 829 (emphasis added).

the Board to find a violation where the only substantial evidence supporting that finding is drawn from events occurring prior to the allowable six-month period would violate the section's clear purpose

> "to bar litigation over past events 'after records have been destroyed, witnesses have gone elsewhere, and recollections of the events in question have become dim and confused,' * * *."

The nature of the Act is such that unfair labor practices depend generally upon the existence of some illicit intent, proof of which often involves inferences drawn from conduct over a long period of time. Here, for instance, much of the evidence in question antedated the charge by more than three years. Even longer delays are by no means inconceivable. When such evidence provides the principal foundation for an unfair labor practice claim, an approach which makes determinative the fact that the claim "technically" dates back only six months fails to deal adequately with reality. To allow primary reliance on evidence drawn from a time prior to the limitations period cannot, therefore, be reconciled with the thrust of section 10(b), and we endorse the Board decisions which so hold.

To recapitulate, then, we hold that while evidence of events occurring more than six months before the filing of a charge may be used to "shed light" upon events taking place within the six-month period, the evidence of a violation drawn from within that period must be reasonably substantial in its own right.[6] Where, as here, that condition is not met, it is impermissible under the policies embodied in section 10(b) for a finding of an unfair labor practice to be justified by primary reliance on the earlier events. Thus the Board's conclusion that MacMillan improperly refused to

bargain with the union during the applicable limitations period cannot be upheld.

The order of the Board is enforced only insofar as it relates to the discriminatory withholding of vacation pay. Enforcement of the order is denied with respect to the finding of a refusal to bargain.

---

6. We use the term "substantial" merely in the sense of "significant" or "not inconsiderable," and do not of course intend to indicate that the evidence drawn from within the limitations period must of itself, considered apart from earlier evidence which may help to explain the events in question, be sufficient to sustain an unfair labor practice finding in enforcement or review proceedings.