**ASSOCIATION of FLIGHT ATTENDANTS, AFL–CIO, Plaintiff–Appellee,**

v.

**HORIZON AIR INDUSTRIES, INC., Defendant–Appellant.**

**Nos. 90–35807, 91–35246.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 6, 1992.

Decided Oct. 1, 1992.

Louis D. Peterson and Michael R. Scott, Hillis, Clark Martin & Peterson, Seattle, Wash., Calvin L. Keith and Benjamin J. Brownfain, Perkins Coie, Portland, Or., Paul D. Jones, Ford & Harrison, Atlanta, Ga., for defendant-appellant.

Deborah Greenfield and Edward J. Gilmartin, Ass'n of Flight Attendants, Washington, D.C., for plaintiff-appellee.

Before: BROWNING, D.W. NELSON and CANBY, Circuit Judges.

JAMES R. BROWNING, Circuit Judge:

On August 7, 1987, following a difficult organizing campaign, the National Mediation Board certified the Association of Flight Attendants, AFL–CIO as the representative of the flight attendants of Horizon Air Industries, Inc. After more than a year of sporadic negotiations over an initial contract, the union requested the intervention of the National Mediation Board in November 1988. Negotiations remained largely unproductive, and on April 28, 1989 the union filed suit against Horizon under the Railway Labor Act (RLA), alleging Horizon had violated its duty under 45 U.S.C. § 152 First to "exert every reasonable effort" to reach agreement with the union.

After a four-day bench trial, the district court ruled in favor of the union and ordered Horizon to "cease and desist from engaging in any conduct that is designed to

forestall an agreement." The court also awarded the union $250,713.50 in attorney's fees and $23,767.38 in costs. Horizon appeals each of these rulings.[1]

We affirm the district court's ruling that Horizon violated § 152 First and affirm a portion of the award of costs. We reverse the remaining portion of the cost award and reverse the award of attorney's fees.

### I.

The RLA imposes a general duty on rail and air carriers and their employees to

> exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152 First.[2]

The duty to "exert every reasonable effort" to reach an agreement is "a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis." *Chicago & North Western Ry. Co. v. United Transp. Union*, 402 U.S. 570, 577, 91 S.Ct. 1731, 1735, 29 L.Ed.2d 187 (1971); *see also Air Line Pilots Ass'n v. Transamerica Airlines, Inc.*, 817 F.2d 510, 513–14 (9th Cir.1987) (federal courts have jurisdiction to enforce 45 U.S.C. § 152 First through Fourth even if the parties are contemporaneously engaged in mediation).

### A.

Horizon contends the district court's citation of cases decided under the National Labor Relations Act (NLRA) indicates it erroneously measured Horizon's conduct against the NLRA's requirement that par-

---

1. The district court also ruled Horizon violated 45 U.S.C. § 152 Third, Fourth & Ninth by sending surveys to its flight attendants on May 22, 1988 and April 6, 1989 concerning issues then under negotiation with the union. The court ordered Horizon to "cease and desist from ... any effort to bargain directly with flight attend-

ants over any subject of bargaining between the parties." Horizon does not appeal this portion of the district court's decision.

2. 45 U.S.C. §§ 181–82 apply § 152 to "every common carrier by air engaged in interstate or foreign commerce."

ties bargain in good faith rather than against the RLA's requirement that they exert every reasonable effort to reach an agreement.[3]

■ Although the RLA and NLRA do not establish identical bargaining obligations, *Pacific Fruit Express v. Union Pacific*, 826 F.2d 920, 922 (9th Cir.1987), courts may consult NLRA cases "for assistance in construing the Railway Labor Act." *Bhd. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 383, 89 S.Ct. 1109, 1118, 22 L.Ed.2d 344 (1969). In *Jacksonville Terminal*, the Supreme Court described the NLRA as "the only existing congressional expression as to the permissible bounds of economic combat," and relied upon it in defining the preemptive effect of the RLA on state law. *Id.* However, the Court also cautioned that the NLRA "cannot be imported wholesale into the railway labor arena. Even rough analogies must be drawn circumspectly, with due regard for the many differences between the statutory schemes." *Id.*

■ In considering the meaning of 45 U.S.C. § 152 First's command to "exert every reasonable effort" to reach an agreement, the Court in *Chicago & North Western Ry.* cited cases and commentary interpreting the NLRA's duty to bargain in good faith. *See* 402 U.S. at 574–75, 578, 91 S.Ct. at 1734, 1735. Quoting *NLRB v. Reed & Prince Mfg. Co.*, 205 F.2d 131, 134 (1st Cir.1953), an NLRA case, the Court stated that "the obligation [to exert every reasonable effort] is central to the effective working of the [RLA]. The strictest compliance with the formal procedures of the Act is meaningless if one party goes through the motions with 'a desire not to reach an agreement.'" 402 U.S. at 578, 91 S.Ct. at 1736. The Court noted, "we have no occasion to determine whether [45 U.S.C. § 152 First] requires *more* of the

parties than the avoidance of 'bad faith' as defined by Judge Magruder in *Reed & Prince.*" *Id.* at 579 n. 11, 91 S.Ct. at 1736 n. 11 (emphasis added).[4] Thus the Court clearly held the duty to "exert every reasonable effort" imposed by the RLA requires *at least* "the avoidance of 'bad faith' as defined" under the NLRA, that is, "go[ing] through the motions with 'a desire not to reach an agreement.'"

In the present case the district court repeatedly stated the standard to be applied in these terms, and referred to NLRA cases for examples of conduct constituting evidence of bad faith defined in this same way. Thus, the court relied upon NLRA cases solely to impose the duty upon Horizon that the Supreme Court has held to be common to both statutes. Significantly, the court's decree prohibited Horizon only from "engaging in any conduct that is designed to forestall an agreement" with the union. The district court ordered Horizon to perform only its existing duty under the RLA and did not impose upon it any duties derived from the NLRA.

**B.**

■ Horizon argues the district court improperly intruded into the negotiations between Horizon and the union by considering Horizon's substantive bargaining positions as evidence of the company's desire not to reach an agreement.

As the Supreme Court has warned, "great circumspection should be used in going beyond cases involving 'desire not to reach an agreement,' for doing so risks infringement with the substantive terms of collective bargaining agreements." *Chicago & North Western Ry.*, 402 U.S. at 579 n. 11, 91 S.Ct. at 1736 n. 11; *see also Regional Airline Pilots Ass'n v. Wings West Airlines, Inc.*, 915 F.2d 1399, 1402 (9th Cir. 1990) ("the federal courts' obligation is to

---

**3.** The NLRA imposes a duty to "exert every reasonable effort to make and maintain agreements," *29 U.S.C.* § *174(a)(1), and provides that* the failure to "meet at reasonable times and confer in good faith" is an unfair labor practice. 29 U.S.C. § 158(d).

**4.** The Court repeated its admonition that

parallels between the duty to bargain in good faith and the duty to exert every reasonable effort, like all parallels between the NLRA and the [RLA], should be drawn with the utmost care and with full awareness of the differences between the statutory schemes. *Id.*

oversee the broad structure of the process and prevent major deviations, not to be involved in particulars of the bargaining process").

Courts must resist finding violations of the RLA based solely on evidence of hard bargaining, inability to reach agreement, or intransigent positions. At the same time, the duty imposed by the RLA to exert every reasonable effort to reach an agreement "at least requires the employer to meet and confer with the authorized representative of its employees, to listen to their complaints, to make reasonable effort to compose differences." *Virginian Ry. Co. v. Sys. Fed'n No. 40, Ry. Employees Dep't, AFL*, 300 U.S. 515, 548, 57 S.Ct. 592, 599, 81 L.Ed. 789 (1937). " 'It was not enough for the law to compel the parties to meet and treat without passing judgment upon the quality of the negotiations. The bargaining status of a union can be destroyed by going through the motions of negotiating almost as easily as by bluntly withholding recognition.' " *Chicago & North Western Ry.*, 402 U.S. at 575, 91 S.Ct. at 1734 (quoting Archibald Cox, *The Duty to Bargain in Good Faith*, 71 *Harv.L.Rev.* 1401, 1412–13 (1958)). Although the initial inquiry is whether the parties have complied "with the formal procedures" of the RLA by meeting and exchanging proposals, a court must also determine whether "one party [has gone] through the motions with a desire not to reach an agreement." *Id.* at 578, 91 S.Ct. at 1736 (internal quotation marks omitted). To determine whether the parties have engaged in reasonable efforts to reach an agreement or merely gone through the motions, some inquiry into the substance of the negotiations is inescapable, not to weigh the reasonableness of the proposals but only to determine whether they were of such a nature as to indicate an intention not to reach an agreement at all.

The district court was aware of the circumscribed nature of its inquiry and resisted efforts of both parties to focus on the substance of bargaining proposals. Dur-

ing the trial, counsel for Horizon and the Court engaged in the following exchange:

COUNSEL FOR HORIZON: .... [The union] is arguing ... that our bargaining proposals aren't acceptable, that they're patently unacceptable. But yet when you look at the agreements that are reached, that the parties reached together, you see ... that they're not patently unacceptable.

THE COURT: .... I'm not sure that's the base issue. I think the base issue is whether or not one party or the other really went to the bargaining table with the idea that they weren't going to agree, so they were not going to make the good faith or every reasonable effort to reach an agreement.... [I]f once I see that, then I've got to remedy it.

In its opinion, the district court referred to Horizon's proposals only as evidence of the company's unwillingness to bargain.

### C.

We review for clear error the district court's finding that Horizon violated 45 U.S.C. § 152 First by failing to exert every reasonable effort to reach an agreement. *Trans Int'l Airlines v. Int'l Bhd. of Teamsters*, 650 F.2d 949, 958–59 (9th Cir. 1980).[5]

The district court found Horizon "engaged in the mere pretense of negotiation" and adopted "evasive and dilatory tactics" that revealed an intent to "wait until the union acceded to its demands." Specifically, the court found: 1) Horizon displayed a general attitude of hostility towards the collective bargaining process; 2) Horizon attempted to "frustrate the negotiations schedule" by "refusing to release flight attendants for negotiations and insisting on scheduling infrequent negotiating sessions"; 3) Horizon's negotiator made "numerous derogatory statements ... about the bargaining process during the negotiations"; 4) "Horizon sought to bargain directly with the flight attendants over mandatory subjects of bargaining" in violation of 45 U.S.C. § 152 Third, Fourth & Ninth;

---

5. We are also mindful that "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Fed. R.Civ.P. 52(a).

and 5) Horizon intentionally made contract proposals "which it knew were so consistently and predictably unpalatable to the [union] so as to show that Horizon intended that the parties not reach agreement." The evidence supports the district court's findings.

Prior to the union organizing campaign, Horizon printed a handbook for supervisory employees that included a section on "union avoidance." The handbook directed supervisors to "[t]ell employees of the disadvantages that could result from a union environment." The handbook also suggested that supervisors describe the collective bargaining process as "almost interminable," and informed employees "you cannot assume that a quick agreement would be reached, or even that any agreement would be reached." A flight attendant testified that Horizon's chief operating officer opposed the union's organizing campaign by declaring, "I'll fight you every step of the way if it takes me two years, and if you strike, I'll fire and replace every damned one of you." She also stated Horizon warned new flight attendants to stay away from the union. Another flight attendant testified the Director of In–Flight Operations told her, "If you do get a union contract, Horizon Air will violate the contract and you'll have so many grievances that AFA will not be able to afford you and they'll just drop you." The chief operating officer sent a letter to all flight attendants, stating a union would not be "constructive" and warning, "Unionization of employee groups is the beginning of the end" of Horizon's effort to be an "extraordinary" company.

Horizon's opposition to the union continued after the union was certified. During the negotiations, Horizon refused to release flight attendant negotiators from their duties to attend negotiating sessions, even though the union offered to pay for the lost time. The company eventually signed an agreement with the union to allow flight attendant negotiators to attend, but later rescinded it unilaterally. Horizon refused to meet on Mondays, Tuesdays, Friday afternoons, and weekends, and cancelled several negotiating sessions.

Because of Horizon's scheduling problems, the parties met only six times from September through December, 1987. There was testimony this conduct frustrated the progress of negotiations and was not the usual practice in the industry.

The court also heard testimony that Horizon's spokesman in negotiations, Arthur Thomas, repeatedly disparaged the union's proposals, the collective bargaining process, and individual union negotiators. When asked why Horizon gave better working conditions to pilots than to flight attendants, Thomas responded the flight attendants got less because they were in "an adversarial relationship" with the company. Thomas said the negotiations were "deadlocked" unless the union used Horizon's proposals as the basis for negotiation, and declared the negotiations were a "waste of his time." Admitting these and other comments, Thomas testified:

> I didn't see that getting it done ... was that advantageous.
>
> I should say here too that I felt some time was needed for expectations that had been raised in the campaign to lower....
>
> This was the union's contract negotiations. I wasn't trying to stall it, but neither was I trying to get it done as quickly as if I wanted something.... If I really want something, man, I'm going to push like crazy.

The court's finding that Thomas' "attitude was one of arrogance, intimidation and intractability" and "exceeded that of a strong advocate of company proposals" was not clearly erroneous.

Horizon sent surveys to all flight attendants on May 22, 1988 and April 6, 1989, requesting answers to questions about scheduling and overtime pay. The April 6 questionnaire included the statement, "In many ways, our hands have been tied. Rather tha[n] dwell on the negative, let's look to the future and do ourselves a favor." The district court ruled "Horizon sought to bargain directly with the flight attendants over mandatory subjects of bargaining" in violation of 45 U.S.C. § 152

Third, Fourth & Ninth. *See* n. 1, *supra.* The district court also considered the surveys "evidence [of] Horizon's attempt to undermine [the union's] bargaining status among its flight attendants and to avoid its duty to bargain in good faith."

The district court found a number of Horizon's bargaining positions evidenced "surface bargaining." Horizon's initial proposal allowed Horizon to unilaterally change any work rule at any time for any reason and required the union to recruit replacement workers during strikes; Horizon submitted proposals less advantageous to its flight attendants than existing terms and conditions of employment; Horizon offered proposals substantially less generous than prior proposals or than provisions included in a contemporaneous contract with its nonunion pilots. The parties began to reach agreement only when the union gave way to Horizon's demands or accepted proposals less favorable than the status quo.[6]

█ Horizon contends the district court ignored evidence that Horizon initiated negotiations with the union in March or April of 1989 and the parties subsequently reached agreement on several outstanding issues. A court need not find a party refused to agree on every issue to find that party failed to exert reasonable efforts to reach an agreement. The parties were in fact unable to reach final agreement on a contract. Moreover, the agreement on particular issues to which Horizon refers was not reached until after suit had been filed,

and could be seen by the district court as an effort to stave off liability.

Based upon the evidence before the district court, considered cumulatively, the court's finding that Horizon failed to exert every reasonable effort to reach an agreement as required by 45 U.S.C. § 152 First was not clearly erroneous.[7]

### D.

█ Horizon argues the district court erred in rejecting its contention that the action was barred by the six-month statute of limitations. *See Int'l Ass'n of Mach. & Aerospace Wkrs, AFL–CIO v. Aloha Airlines,* 790 F.2d 727, 735 (9th Cir.1986) (NLRA six-month statute of limitations applies to RLA claims).

A party may not rely solely on events occurring more than six months before suit was filed to establish a violation of the RLA. *Local Lodge No. 1424, Int'l Ass'n of Mach., AFL–CIO v. NLRB,* 362 U.S. 411, 416–20, 80 S.Ct. 822, 826–28, 4 L.Ed.2d 832 (1960). However, events occurring outside the limitations period may be proven "to shed light on the true character of matters occurring within the limitations period," *id.* at 416, 80 S.Ct. at 826, if evidence exists that is "reasonably substantial in its own right" that the violation of the RLA upon which the plaintiff relies occurred within the period. *NLRB v. MacMillan Ring–Free Oil Co.,* 394 F.2d 26, 33 (9th Cir.1968). The evidence of events within the limitations period, "considered apart from earlier evidence which may help to explain the

---

6. At oral argument, Horizon submitted an exhibit of "Agreements Reached Prior to Filing of Complaint" as support for its claims that the district court made erroneous findings. At least three of these agreements—uniforms, furloughs, and duty time expenses—were in fact not completed, and Horizon attempted to reopen negotiations on a previously agreed-to definition. Horizon's exhibit does not contradict the court's finding that several agreements were the result of the union's capitulation to Horizon's demands. Agreement on a few topics, most of them minor, does not establish that Horizon exerted every reasonable effort to reach a final, integrated collective bargaining agreement.

7. Horizon points to two errors of fact in the district court's opinion. (1) The court said the

union's initial proposal to Horizon was based upon company policy and "standard work rules found in other regional flight attendant contracts." In fact the union based its proposal on company policy and its initial proposals to Air Wisconsin, a regional carrier. Air Wisconsin did not accept all of those proposals and neither did Horizon. (2) The district court found a Horizon official had said Horizon would "make it hard" on the flight attendants if they joined the union. Although the union indicated it would present evidence in support of this statement, it did not do so, and the finding is thus not supported by the record.

These minor errors do not undermine the district court's ultimate finding that Horizon failed to exert every reasonable effort to reach an agreement.

events in question," need not be conclusive; significant or considerable evidence that a violation occurred within the limitations period will suffice. *Id.* at 33 n. 6.

The district court found Horizon violated § 152 First within six months of the filing of suit because "Horizon continued to thwart the negotiation process from October 28, 1988 until the filing of this action on April 28, 1989." Specifically, the court found:

> Horizon's "evasive and dilatory" scheduling tactics, "take it or leave it" comments and ultimatums, regressive proposals, refusal to entertain proposals or to make counterproposals, rejection of agreed to proposals and survey of flight attendants on mandatory subjects of bargaining all occurred within the six-month statute of limitations period.

The court also found this conduct was a continuation of earlier conduct beginning with Horizon's opposition to the union's effort to organize Horizon's flight attendants.

As we have said, it was not error for the court to rely on evidence of earlier conduct to explain the events that occurred within the limitations period. The court's findings that Horizon engaged in bad faith bargaining within the limitations period are not clearly erroneous. There is evidence Horizon continued to delay the scheduling of negotiating sessions, and Thomas continued to express hostility toward the bargaining during the six month period. Some of Horizon's proposals during this period, such as its suggested maternity leave policy, provided fewer benefits than the status quo. Horizon refused to bargain with the union over various issues, such as the right to wear a union pin and the possibility of a dues check-off. Horizon did not renege on agreed-to proposals during the limitations period, but it pursued its efforts to reopen negotiations on the definition of a "check flight attendant." Horizon also conducted one of its flight attendant surveys on man-datory bargaining subjects during the limitations period.

## II.

■ Horizon challenges the district court's award of attorney's fees to the union.

### A.

The union contends the district court had equitable power to award fees under the bad faith exception to the American rule. *See Alyeska Pipeline Serv. Co. v. Wilderness Society,* 421 U.S. 240, 257–59, 95 S.Ct. 1612, 1621–23, 44 L.Ed.2d 141 (1975); *Newman v. Piggie Park Ent.,* 390 U.S. 400, 402 n. 4, 88 S.Ct. 964, 966 n. 4, 19 L.Ed.2d 1263 (1968) (first recognizing the bad faith exception). The union does not contend Horizon conducted the present litigation in bad faith or asserted a frivolous defense, but argues Horizon demonstrated bad faith by violating its duty to exert every reasonable effort to reach an agreement with the union. Horizon responds that the bad faith exception does not apply to conduct that constitutes the cause of action; the union counters that the Ninth Circuit has held to the contrary.[8]

Two terms ago, in *Chambers v. NASCO,* — U.S. ——, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), the Supreme Court, in the course of an opinion sustaining an award of attorney's fees based upon bad faith in the conduct of litigation, took care to explain that it was not reaching the issue whether a court had inherent power to sanction a party for bad faith conduct relating to the underlying cause of action—in that case, for breach of contract. *Id.* — U.S. at —— & n. 16, 111 S.Ct. at 2138 & n. 16. While recognizing the limitation in the majority decision, four Justices nonetheless took the opportunity to assert strongly that the inherent power of a federal court to award fees for bad faith conduct does not extend to the conduct upon which the suit is based. Justice Kennedy stated,

**8.** The union cites three Ninth Circuit cases: *Dollar Systems v. Avcar Leasing Systems,* 890 F.2d 165, 176 (9th Cir.1989); *McQuiston v. Marsh,* 707 F.2d 1082, 1086 (9th Cir.1983); *Dogherra v. Safeway Stores, Inc.,* 679 F.2d 1293, 1298 (9th Cir.1982).

it is impermissible to allow a District Court acting pursuant to its inherent authority to sanction such prelitigation primary conduct. A court's inherent authority extends only to remedy abuses of the judicial ... process. When a federal court, through invocation of its inherent powers, sanctions a party for bad-faith prelitigation conduct, it goes well beyond the exception to the American Rule and violates the Rule's careful balance between open access to the federal court system and penalties for the willful abuse of it.

*Id.* — U.S. at —, 111 S.Ct. at 2148 (Kennedy, J., dissenting); *see also id.* — U.S. at —, 111 S.Ct. at 2141 (Scalia, J., dissenting). This is the uniform view among the circuits, unless, as the union claims, this circuit is an exception. *See Sanchez v. Rowe*, 870 F.2d 291, 295 (5th Cir.1989); *Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1014 (11th Cir.

1985); *Shimman v. Int'l Union of Operating Eng'r*, 744 F.2d 1226, 1232–33 (6th Cir.1984) (en banc); *see also* 6 Moore's Federal Practice ¶ 54.78[3], at 54–506 (1987 ed. & supp.) (limiting the bad faith exception to conduct during litigation is the "better supported" view).[9]

The cases from this court upon which the union relies do not clearly establish a contrary rule. Two of the three cases involve bad faith in the conduct of the litigation,[10] and the third is ambiguous.[11] In none of the three did the alleged bad faith clearly relate only to conduct constituting the cause of action. At most, the cases may suggest prelitigation conduct might be relevant to an award of fees for bad faith conduct during the litigation.

Each of our cases relied on the statement in *Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973), that " 'bad faith' may be found, *not only in the actions that led to the lawsuit*, but also in the conduct of

**9.** *Richardson v. Communications Wkrs. of Am., AFL–CIO*, 530 F.2d 126 (8th Cir.1976), may be an exception. The court affirmed an award of attorney's fees for bad faith after a union deliberately breached its duty to represent one of its members. *Id.* at 132–33. The court did not consider whether the bad faith exception applied to conduct constituting a cause of action and stated only that "the Unions' bad faith comes within the bad faith exception noted in *Alyeska* [421 U.S. at 258–59, 95 S.Ct. at 1622]." *Id.* at 133. The Sixth Circuit has cautioned that "[c]are must be taken to distinguish a defendant's bad faith in necessitating that an action be filed ... from a defendant's bad faith in the acts giving rise to the claim." *Shimman*, 744 F.2d at 1230. The former situation can provide the basis for an award of fees if the bad faith occurs "after the original claim arises." *Id.* at 1232. Because the union deliberately violated its member's right to representation, *Richardson* may involve both bad faith in refusing to recognize a clear legal right, thus necessitating that an action be filed, *and* bad faith in the conduct underlying the cause of action. This combination would make *Richardson* an exceptional case in which a fee award was justified. *See Dollar Systems*, 890 F.2d at 175. Moreover, to the extent that *Richardson* does support an award of fees for bad faith conduct underlying the cause of action, we decline to adopt the reasoning of the Eighth Circuit.

**10.** In *Dogherra*, the district court found bad faith because the defendant "pursued the action after it discovered [one of its employees had lied], particularly by bringing needless, almost

frivolous motions." 679 F.2d at 1298. In *Dollar Systems*, we ruled that fabrication of a disclosure date revealed bad faith conduct "both prior to and during the course of the litigation." 890 F.2d at 176. The fabrication was not part of the cause of action and appeared to have been made during or in anticipation of litigation. *See Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 673 F.Supp. 1493, 1503 (C.D.Cal.1987).

**11.** *McQuiston* involved a dispute between a contractor and the United States Army. The court remanded to the district court because "[t]he parties raise[d] a factual dispute as to the bad faith, if any, of the government both before and during the course of this litigation." 707 F.2d at 1086. On remand, the district court found no bad faith in any government conduct before or during the litigation. *See McQuiston v. Marsh*, 790 F.2d 798, 801 (9th Cir.1986) (affirming district court's denial of fees).

A fourth Ninth Circuit case not cited by either party, is equally ambiguous. In *Lauritzen v. Lehman*, 736 F.2d 550 (9th Cir.1984), we stated a fee award "may be based on the actions that led to a lawsuit," and remanded for a determination whether "the Navy's prelitigation conduct justifies a fee award." *Id.* at 559 (citing *McQuiston*, 707 F.2d at 1086). We did not specify what kind of prelitigation conduct would justify a fee award, but the fact that the Board for Correction of Naval Records granted full relief to Lauritzen suggests the Navy refused to recognize a clear legal right. *See* n. 9, *supra* (discussing the award of fees for the bad faith refusal to recognize a clear legal right).

the litigation." *Id.* at 15, 93 S.Ct. at 1951. (emphasis added). The *Hall v. Cole* statement itself is ambiguous. It is not clear that the phrase "actions that led to the lawsuit" refers to conduct constituting the cause of action; it may refer instead to bad faith conduct in filing a frivolous or vexatious lawsuit. The Supreme Court appears to have given the latter meaning to the phrase in *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980).[12] Moreover, the Sixth Circuit has argued persuasively that *Hall v. Cole* discussed bad faith only in the context of whether the relative equities between the parties were determinative in deciding whether to allow a fee award under the common benefit exception to the American Rule. *See Shimman*, 744 F.2d at 1232–33.[13]

In any event, no federal appellate authority in or out of the Ninth Circuit has clearly approved an order shifting attorney's fees based solely upon a finding of bad faith as an element of the cause of action presented in the underlying suit. We decline to do so. Expansively applied, the bad faith excep-

tion risks conflict with the rationale of the American rule [14] and hence should be construed narrowly. *See Shimman*, 744 F.2d at 1231–32. Moreover, expanding the exception to encompass cases in which the only bad faith alleged is an element of the cause of action would appear to justify an award of fees in every fraud case.[15] Perhaps this is one of the reasons underlying the accepted rule that " '[a]n award of attorneys' fees for bad faith ... can be imposed only in exceptional cases and for dominating reasons of justice.' " *Dollar Systems*, 890 F.2d at 175 (quoting *Dogherra*, 679 F.2d at 1298); *see also Lauritzen*, 736 F.2d at 559 n. 13 (same). Nothing in the record indicates the present case involved more than a run-of-the-mill dispute under 45 U.S.C. § 152 First or that "dominating reasons of justice" require an award of fees. Although the district court's conclusion that Horizon failed to exert every reasonable effort to reach an agreement was not clearly erroneous, the case presented a close question.[16] Our affirmance of the district court's holding that Hori-

---

**12.** In *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980), the Supreme Court said:

The bad-faith exception for the award of attorney's fees is not restricted to cases where the action is filed in bad faith. " '[B]ad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation." *Hall v. Cole,* 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702 (1973). This view coincides with the ruling in [*Link v. Wabash Rail Co.,* 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) ], which approved judicial power to dismiss a case not because the substantive claim was without merit, but because the plaintiff failed to pursue the litigation. *Id.* 447 U.S. at 766, 100 S.Ct. at 2464 (citation omitted). Thus, the Court equated "actions that led to the lawsuit" in the *Hall v. Cole* dictum with "cases where the action is filed in bad faith."

**13.** The Court stated in *Hall v. Cole* that "[t]he instant case is clearly governed by" the common benefit exception. 412 U.S. at 7, 93 S.Ct. at 1947. In *F.D. Rich Co. v. Indus. Lumber Co.,* 417 U.S. 116, 129–30 & n. 18, 94 S.Ct. 2157, 2 & n. 18, 40 L.Ed.2d 703 (1974), and *Alyeska,* 421 U.S. at 257–59, 95 S.Ct. at 1621–22, the Court discussed the exceptions to the American rule, including bad faith, but cited *Hall v. Cole* only as a common benefit case.

**14.** As the court said in *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 718, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967) (citations omitted),

since litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit, and ... the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel. Also, the time, expense, and difficulties of proof inherent in litigating the question of what constitutes reasonable attorney's fees would pose substantial burdens for judicial administration.

**15.** *See* Jane P. Mallor, *Punitive Attorneys' Fees for Abuses of the Judicial System,* 61 N.C.L.Rev. 613, 634 (1983) (expanding the rule to include bad faith conduct that gives rise to a cause of action "could open the door to fee shifting in the ordinary tort or contract case").

**16.** We assume without deciding that the district court's finding that Horizon failed "to use every reasonable effort to reach an agreement," which we found not clearly erroneous, is equivalent to a finding that Horizon "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," as would be required by the bad faith exception to the American rule if it applied to conduct constituting an element of a cause of action.

zon's conduct fell on the wrong side of the line established by 45 U.S.C. § 152 First does not mark this case as an exceptional one justifying an award of attorney's fees.

### B.

 The union also contends the fee award is justified as an exercise of the authority vested in the district court to remedy violations of the RLA "by whatever appropriate means might be developed on a case-by-case basis." *Chicago & North Western Ry.*, 402 U.S. at 577, 91 S.Ct. at 1735.[17] We find no evidence that Congress intended "such a radical departure from the long-established American rule" when it gave the district courts broad remedial powers under the RLA. *Runyon v. McCrary*, 427 U.S. 160, 185, 96 S.Ct. 2586, 2601, 49 L.Ed.2d 415 (1976) (holding the broad language of 42 U.S.C. § 1988 did not include an implicit exception to the American rule).

 "[G]eneral labor policy disfavors punishment," and the Supreme Court "has refused to permit punitive sanctions" in most cases arising under federal labor statutes. *Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 52, 99 S.Ct. 2121, 2127, 60 L.Ed.2d 698 (1979) (punitive damages are not available in RLA actions for breach of a union's duty of fair representation). An award of attorney's fees under the bad faith exception is not remedial; "the underlying rationale ... is ... punitive." *Hall v. Cole*, 412 U.S. at 5, 93 S.Ct. at 1946.

Moreover, the RLA emphasizes dialogue between management and labor as a means "to facilitate collective bargaining and to achieve industrial peace." *Foust*, 442 U.S. at 47, 99 S.Ct. at 2125. Congress designed the negotiating process to be "long and drawn out, based on the hope that reason and practical considerations will provide in time an agreement that resolves the dispute." *Bhd. of Ry. & S.S. Clerks v. Florida East Coast Ry.*, 384 U.S. 238, 246, 86 S.Ct. 1420, 1424, 16 L.Ed.2d 501 (1966).[18] Approving an award of fees to the union in this case would encourage parties to bypass the RLA's mediation and arbitration provisions in favor of litigation, and undermine the statute's goal of assisting the parties to "work out disputes themselves, with a minimum of judicial intervention." *Pacific Fruit Express*, 826 F.2d at 923. An award of fees would also discourage parties from engaging in the dialogue and compromise necessary to "collective bargaining and ... industrial peace." *Foust*, 442 U.S. at 47, 99 S.Ct. at 2125.

### III.

 Horizon challenges the award to the union of witness fees, expert witness fees, and costs of both trial and deposition transcripts. We review the district court's award of costs for abuse of discretion. *Alflex Corp. v. Underwriters Lab., Inc.*, 914 F.2d 175, 176 (9th Cir.1990).

We affirm the awards of $660.00 in statutory witness fees, $2,028.00 for the cost of trial transcripts, and $5,016.16 in costs for deposition transcripts. The district court had authority under Fed.R.Civ.P. 54(d) and 28 U.S.C. § 1920 to make each of these awards, and our review of the record reveals no abuse of discretion.

The district court's award of expert witness fees of $8,152.81, however, was in excess of the forty-dollar-per-day limit provided in 28 U.S.C. § 1821(b). The district court relied on our opinion in *United States*

---

17. The only provision of the RLA that explicitly provides for an award of attorneys fees is 45 U.S.C. § 153 First (p), which allows recovery of fees by a party seeking to enforce an order of the National Railroad Adjustment Board. The presence of this provision is not dispositive of the question whether fees could be awarded in suits brought under other provisions of the RLA. *See Hall v. Cole*, 412 U.S. at 10–11, 93 S.Ct. at 1948–49.

18. *See also* H.R.Rep. No. 328, 69th Cong., 1st Sess. 1 (1926), *reprinted in* Senate Committee on Labor and Public Welfare, Legislative History of the Railway Labor Act, As Amended (1926 through 1966), at 47 (1974); Charles M. Rehmus, *Evolution of Legislation Affecting Collective Bargaining in the Railroad and Airline Industries,* in The Railway Labor Act at Fifty 1, 8 (Charles M. Rehmus ed. 1977) ("The underlying philosophy of the law [is] almost total reliance on collective bargaining for the settlement of labor-management disputes.").

*v. City of Twin Falls,* 806 F.2d 862 (9th Cir.1986), which the Supreme Court effectively overruled in *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 442, 107 S.Ct. 2494, 2497, 96 L.Ed.2d 385 (1987) ("a federal court may tax expert witness fees in excess of the [ ] limit set out in § 1821(b) only when the witness is court appointed."). Since Brennan was not a court appointed expert, the union is entitled only to the statutory amount, and we reverse this portion of the award of costs.

### Conclusion.

We affirm the district court's ruling that Horizon violated 45 U.S.C. § 152 First. We reverse the district court's award of attorney's fees. We affirm the award of costs, except for the award of expert witness fees, which we reverse.

AFFIRMED IN PART, REVERSED IN PART. Each side to bear its own costs on appeal.