**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO and District Lodge 142, International Association of Machinists and Aerospace Workers, Plaintiffs,**

v.

**VARIG BRAZILIAN AIRLINES, INC., Defendant.**

No. CV–94–0628.

United States District Court, E.D. New York.

June 21, 1994.

ciation of Machinists and Aerospace Workers, AFL–CIO ("IAM") and District Lodge 142, International Association of Machinists and Aerospace Workers ("IAM District Lodge 142") (collectively, the "Union"). This complaint is the result of a failed effort by the parties to negotiate a new collective bargaining agreement; the Union alleges several violations of the Railway Labor Act, 45 U.S.C. §§ 151–188 (the "RLA"). For the following reasons, Varig's motion is granted.

## FACTS

Varig is a Brazilian corporation and is a "common carrier by air engaged in interstate or foreign commerce[.]" 45 U.S.C. § 181. Plaintiff IAM is an unincorporated labor organization representing employees in the airline industry and is a "representative" as that term is defined in 45 U.S.C. § 151 Sixth.[1] IAM is the certified collective bargaining representative of approximately 320 Varig employees. IAM District Lodge 142 is also an unincorporated labor organization and the bargaining agent for the IAM with Varig.

The IAM and Varig are parties to a collective bargaining agreement, made and entered into on May 3, 1990; the collective bargaining agreement became amendable on September 1, 1992.[2] Pursuant to the statutory procedures for amending collective bargaining agreements in the airline industry, 45 U.S.C. § 156,[3] the Union and Varig exchanged their "section 6 notices," so called because they were exchanged pursuant to Section 6 of the RLA (codified as 45 U.S.C.

Joseph Guerrieri, Jr., David P. Dean, Guerrieri, Edmond & James, P.C., Washington, DC, Sidney Fox, Gerald Richman, Shapiro, Shiff, Beilly, Rosenberg & Fox, New York City, for plaintiffs.

Lee R.A. Seham, Seham, Seham, Meltz & Petersen, New York City, for defendant.

## MEMORANDUM AND ORDER

GLASSER, United States District Judge:

This is a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 by Varig Brazilian Airlines, Inc. ("Varig" or the "Company"), seeking a dismissal of the three causes of action contained in the complaint brought by the International Asso-

---

1. This subsection provides that "[t]he term 'representative' means any person or persons, labor union, organization, or corporation designated either by a carrier or group of carriers or by its or their employees, to act for it or them." 45 U.S.C. § 151 Sixth.

2. Complaint, ¶ 13; Def.'s 3(g) Statement, ¶ 3. The collective bargaining agreement states in relevant part that it "shall continue in full force and effect until August 31, 1992[.]" Although the Complaint states that the collective bargaining agreement was entered into on May 3, 1990, the document itself states that the agreement shall become effective September 1, 1988.

3. This subsection provides, in relevant part, that "[c]arriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions, and the time and place for the beginning of conference between the representatives of the parties interested in such intended changes shall be agreed upon within ten days after the receipt of said notice, and said time shall be within thirty days provided in the notice." 45 U.S.C. § 156.

§ 156).[4] The Company's and IAM's section 6 notices, dated July 17, 1992, and July 21, 1992, respectively. Complaint, ¶ 13, were not made part of the record. The first meeting between the two parties was held on September 16, 1992, Affidavit of Martin C. Seham, March 16, 1994 ("Seham Aff'd"), ¶ 2, and each side exchanged a list of proposed changes for the collective bargaining agreement.[5]

In their list, dated September 11, 1992, Varig proposed, among other things, that "[a]ll restrictions on sub[-]contracting shall be eliminated." Seham Aff'd, Ex. A.[6] Varig's September 11, 1992 list runs for eight pages and includes several dozen items, including a proposition to eliminate Article XVIII ("Union Security") of the agreement.[7] Plaintiffs' September 1, 1992 list runs for six pages and includes over twenty items, including proposals on bonuses, wage increases and overtime, and holidays. Complaint, Ex. 1.

In a document dated January 13, 1993, entitled "Varig/IAM Negotiations," and presented to the Union at a meeting on the same day, Varig stated that "[i]n lieu of the Company's proposal to eliminate all restrictions on subcontracting, the Company proposes [several] measures[.]" Complaint, Ex. 3. The changes suggested by the Company included, *inter alia*, a confirmation in the collective bargaining agreement that work done by a shipper or shipper's agent on premises other than Varig would not constitute subcontracting; a confirmation that work performed by Varig employees at premises not covered by the collective bar-

gaining agreement would not constitute subcontracting; and that severance pay will be paid to any employee permanently displaced because of the application of the new measures. Varig's January 13, 1993 proposal expired by its terms on February 13, 1993, and included a total of five items for discussion: duration, supplemental pension plan, wage scale, medical coverage, and subcontracting.

On February 9, 1993, Varig applied for mediation services from the National Mediation Board (the "NMB"), pursuant to 45 U.S.C. § 155 First.[8] The parties began mediated negotiations in April of 1993 and met on several occasions over a three month period. In a document entitled "Varig Proposals" and dated April 14, 1993, the Company informed the Union that it was its position that "[t]here shall be no limitations on the company's right to subcontract." Complaint, Ex. 5. The April 14, 1993 proposals were also set to expire in one month's time and included a total of seven items: wage rates, duration, medical coverage, subcontracting, seniority rights, holidays, and a reduction in starting and limiting progression of wage scales for those hired after the revised contract is in effect. In a letter dated April 19, 1993, the Company also proposed elimination of Article XII(e) of the collective bargaining agreement which provided that the Union would have the right to designate the broker of record for the life and health insurance and pension plans for unionized employees. Complaint, Ex. 6. In a letter dated June 9, 1993, the Company reiterated its position that it must

---

4. District Lodge 142's predecessor, IAM District Lodge 100, originally participated in the bargaining process. District Lodge 142 replaced IAM District Lodge 100 in November of 1992. Complaint, ¶ 14.

5. It is undisputed that these first lists of proposed changes to the collective bargaining agreement are substantially similar to, and incorporate, the elements of each party's section 6 notice.

6. Article II of the collective bargaining agreement provides, in relevant part, that "[i]t is understood the Company reserves the right to continue contracting out work historically contracted out and to return to the manufacturer parts and sub-assemblies for repair or replacement, that cannot be repaired on the property due to lack of equipment or because of warranties."

7. This section of the collective bargaining agreement provides, in relevant part, that "[e]xcept as provided otherwise herein, all employees covered by this Agreement who are members of the Union, shall maintain their membership in good standing as a condition of continued employment, so long as this Agreement remains in effect."

8. This subsection provides, in relevant part, that "[t]he parties, or either party, to a dispute between an employee or group of employees and a carrier may invoke the services of the Mediation Board in ... [a] dispute concerning changes in rates of pay, rules, or working conditions not adjusted by the parties in conference." 45 U.S.C. § 155 First(a).

"negotiate the right of limited subcontracting in the Cargo Department." Complaint, Ex. 7 at 2.

In a document entitled "IAM–Varig Contract Union Proposal of Settlement," undated, and set by its own terms to expire on July 17, 1993, the Union submitted a "Proposal of Settlement" which, it stated, "is predicated on the Company's withdrawing any proposals dealing with subcontracting of work other than what is in the present collective bargaining agreement." Complaint, Ex. 8. This counterproposal contained a total of ten items including, *inter alia,* duration, wage increases, early retirement, medical coverage for retirees, a "pause" in Company contributions to the supplemental pension plan, and a new Cigna Network Plan. In a document entitled "Union's Response to Company's Sub–Contracting Proposal," also undated and scheduled to expire on August 3, 1993, the Union stated that its counterproposal was based on the demand that "[t]he Company will withdraw its proposal on subcontracting." Complaint, Ex. 9. These counterproposals by the Union were rejected. Complaint, ¶ 17 ("In June and August, Plaintiffs presented two comprehensive proposals for settlement that were promptly rejected by Varig.").

In a letter dated September 7, 1993, the Company responded to the suggestion of the NMB that it submit its "last proposal in anticipation of the mediation scheduled for September 10, 1993." Complaint, Ex. 10. In a document entitled "Final Position Statement of Varig," dated September 7, 1993, the Company proposed the following vis-a-vis the issue of subcontracting: (i) any restriction on subcontracting shall not apply to work performed on the premises of the shipper, agent, or forwarder for his own or for his principal's account; (ii) work performed by any Varig employees at locations outside of the United States shall not be considered subcontracting; and (iii) subject to certain conditions, there shall be no restriction on the Company's right to subcontract work performed by the Cargo Department. Complaint, Ex. 10. The "Final Position Statement" also included proposals regarding duration, wage increase and reduction, the contribution rate used in calculating medical insurance, limiting the number of agents in the Cargo Department, the Cargo Automation Program, reduction or elimination of the Technical Maintenance job positions in certain circumstances, elimination of broker of record, and severance pay for those laid off due to the new subcontracting proposals.

The Union contends, and the Company vehemently denies, that on November 16, 1993, Martin Seham, Varig's attorney ("Seham"), and William O'Driscoll, President and General Chairman of IAM District Lodge 142 ("O'Driscoll"), reached an oral agreement on new terms to amend the collective bargaining agreement. Complaint, ¶ 22. Declaration of William O'Driscoll, April 27, 1994 ("O'Driscoll Decl."), ¶ 15 ("Mr. Seham and I then agreed that the parties would reach a contract on the basis of the approach I had outlined. This agreement in principle was absolutely clear.").

In short, the Union submits that Seham agreed on behalf of Varig that the Company would not subcontract cargo work in exchange for, among other things, the Union's willingness to agree to a freeze on the Company's five percent contribution to the supplementary pension plan during the life of the new collective bargaining agreement, and its agreement that Varig would be allowed to accept some pre-palletized cargo. Complaint, ¶ 22; O'Driscoll Decl., ¶ 10; Declaration of Robert Roach, Jr. (General Chairman of IAM District Lodge 142), April 27, 1994 ("Roach Decl."), ¶ 13 ("Mr. O'Driscoll informed me that he and Mr. Seham had arrived at a basis for a contract that would not require granting the right to the Company to subcontract bargaining unit work, based on the cost saving proposals that we had previously discussed. Mr. Seham confirmed that afternoon that 'we have the basis for an agreement.'"). Describing this alleged agreement as "The O'Driscoll Hoax," Seham contends that he and O'Driscoll only discussed certain proposals, never reached an agreement, and concludes that "[t]he Agreement ascribed to by Mr. O'Driscoll to me in Paragraph 22 of the Complaint never happened, was never even articulated and is absurd on its face." Seham Aff'd, ¶ 18. (The

Union gave the Company a written proposal, allegedly based on the November 16, 1993 agreement, on December 10, 1993.)

The parties then approached the NMB jointly to request a release from mediation. The Union alleges that this was done in reliance on the agreement allegedly reached with Seham on November 16, 1993. Complaint, ¶ 23. In a letter dated November 17, 1993, the NMB memorialized its understanding that both the Union and Varig had declined to send their dispute to arbitration pursuant to 45 U.S.C. § 155 First,[9] and that the NMB's services have been terminated as of November 17, 1993. Complaint, Ex. 12. With the termination of the NMB's services and the parties' refusal to go to arbitration, a thirty-day "cooling off" period began pursuant to 45 U.S.C. § 155 First.[10] The NMB informed the parties in its letter of November 17, 1993, that "unless the parties subsequently settle this dispute ... nonviolent self-help would be available commencing 12:01 A.M. EST, December 18, 1993."

The Union alleges that during the statutory cooling off period the parties "reaffirmed their agreement in principle, and agreed that the union would put the agreement in writing." Complaint, ¶ 24. Varig contests this characterization and submits that during the meetings which took place during the thirty-day period, "the Union ... regularly threatened the Company with economic damage if the agreement were not signed to its satisfaction within the cooling off period." Seham Aff'd, ¶ 25. Whereas Varig maintains that it never refused to meet during the thirty-day period, Seham Aff'd, ¶ 25, the Union contends that it refused to honor an agreement to meet on December 13 through 17, 1993, but would first be available on December 16, 1993, at the end of the expiration of the thirty-day period, Complaint, ¶ 25.

The parties met again on December 17, 1993, together with representatives of the NMB. At this meeting the Company rejected the December 10, 1993 written proposal by the Union and the Union agreed to put the Company's latest offer to a vote of the membership. Complaint, ¶ 26. In a document entitled, "Final Position Statement of Varig Meeting W/ Mediator & NMB Board Member," dated December 17, 1993, the Company proposed that "[e]xcept for work under the Cargo Automation Program as set out above, there shall be no restriction on the Company's right to subcontract work performed by the Cargo Department." Roach Decl., Ex. B. The "Final Position Statement" is a three page document which includes a total of ten items including, *inter alia*, duration, wage increase, Cargo Automation Program, technical maintenance, and subcontracting. The Union alleges that Varig, at this December 17, 1993 meeting, via Seham, agreed that it would maintain the status quo pending the ratification vote. Complaint, ¶ 26.

The parties met again on December 20, 1993, and the Union informed Varig that its vote would take place on December 28, 1993. Complaint, ¶ 28. The Union alleges that Seham again pledged that the Company would observe the status quo pending the vote. Complaint, ¶ 28. Varig denies that any such promise was made. Answer, ¶ 26; Seham Aff'd, ¶ 30 (Varig agreed to maintain the status quo for a total of 48 hours only).

In a letter dated December 23, 1993, Varig provided the Union with a list of changes that the Company planned on making regarding conditions of employment pursuant to its right to proceed to self-help. Complaint, Ex. 14. The letter was received by the Union on December 27, 1993. The letter stated that "[t]hese are all items that were presented to the union as part of the Company's initial list of contract proposals" and that they would become effective December 27,

---

9. This subsection provides, in relevant part, that, "[i]f such efforts to bring about an amicable settlement through mediation shall be unsuccessful, the said Board shall at once endeavor as its final required action ... to induce the parties to submit their controversy to arbitration, in accordance with the provisions of this chapter." 45 U.S.C. § 155 First.

10. This subsection also provides, in relevant part, that, "[i]f arbitration at the request of the Board shall be refused by one or both parties ... for thirty days thereafter ... no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose." 45 U.S.C. § 155 First.

1993, the day before the scheduled ratification vote. The attached document, entitled "Implementation of Varig's Proposals," dated December 23, 1993, stated that "in addition to the foregoing[,] the Company will implement all provisions of its final proposals of December 17, 1993," which included the statement that, except for certain exceptions, "there shall be no restriction on the Company's right to subcontract work performed by the Cargo Department." The December 23, 1993 implementation document is almost identical to Varig's September 11, 1992 list which included the declaration that Article XVIII (union security clause) would be eliminated. While it is undisputed that the items listed in Varig's implementation document were also included in the Company's section 6 notice, Def.'s 3(g) Statement, ¶ 5, it is also undisputed that several items, including the elimination of Article XVIII, were not specifically negotiated by the parties during the RLA's mandatory mediation procedures, Pls.' 3(g) Statement, ¶ 5. The Union membership rejected the Company's final proposal. Roach Decl., ¶ 32.

In a "Notice to Varig Employees" which was distributed on or about December 24, 1993, Complaint, ¶ 30, Varig informed its employees that "we are advising [the Union] of the implementation of our proposal to eliminate Article XIII—Union Security. Among other things, it deletes any membership obligation by force of the labor contract." Complaint, Ex. 13. The notice also informed Varig employees how they could, if they wanted to, "terminate any further union obligation[.]" The Union contends that this posting is evidence of the Company's intent to interfere with the organization of the Company's employees in violation of 45 U.S.C. § 152 Third and Fourth. Complaint, ¶ 38. Varig contends that this notice was "posted in response to threats of work stoppage and sabotage which had been made by union representatives[.]" Answer, ¶ 30.

\* \* \* \* \* \*

Based on the foregoing events, the Union served and filed the present complaint on or about February 14, 1994. In their complaint, the Union alleges three causes of action: (1) a violation of 45 U.S.C. §§ 152 First and Seventh, and 156 by virtue of the Company "unilaterally changing fundamental conditions of employment ... without ever negotiating, mediating or arbitrating those issues, and by implementing terms not included in the Company's final offer," Complaint, ¶ 34; (2) a violation of the Company's obligation to "exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions" pursuant to 45 U.S.C. § 152 First, Complaint, ¶ 36; and (3) a breach of the Company's statutory obligation not to interfere with the organization of its employees pursuant to 45 U.S.C. § 152 Third and Fourth, Complaint, ¶ 38.

In its Complaint, the Union seeks broad injunctive and declaratory relief although it has not, to date, moved for a temporary restraining order or a preliminary or permanent injunction. The relief sought includes, *inter alia,* a permanent injunction "directing and enjoining" Varig to bargain in good faith with the IAM; rescinding any rate of pay, rules, or working conditions imposed on or after December 27, 1993, that was not contained in Varig's final offer to the IAM; and refraining from any activities that have the intent or effect of undermining the IAM as a collective bargaining representative. Plaintiffs also seek a declaration that Varig has engaged in "unfair labor practices" or statutory violations of the RLA by, among other things, failing to make a reasonable effort to reach an agreement with the Union and imposing rates of pay, rules, and working conditions not contained in its final offer with the IAM. Plaintiffs also seek punitive damages and attorneys' fees and costs. Complaint, wherefore clause, ¶¶ 9, 10.

## DISCUSSION

### I. *Summary Judgment Standard*

To review, or even attempt to review the mass of treatise, law review and judicial literature on summary judgment would be an affectation of research. It will suffice to recognize the observations made by the Supreme Court in three relatively recent cases. In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106

S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986), the Court said,

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" ... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."

(footnote omitted) (citations omitted) (emphasis in original).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Court emphasized once again that granting a motion for summary judgment requires that there be no *genuine* issue of *material* fact. "Only disputes over facts that might affect the outcome of the suit under the governing law will preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. at 2510. The Court went on to teach that "[i]f the evidence is merely colorable ... or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2510–11 (citations omitted).

And finally, in *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986), the Court wrote,

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." ... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rules, prior to trial, that the claims and defenses have no factual basis.

With these principles in mind, the bases asserted by the Union for the relief it seeks will be considered separately.

## II. *The First Cause of Action*

As noted above, plaintiffs have alleged a violation of 45 U.S.C. §§ 152 First and Seventh, and 156 by "unilaterally changing fundamental conditions of employment" by failing to submit those changes to negotiation, arbitration or mediation, and by making changes which were not included in the Company's final offer. Section 152 First of Title 45 of the United States Code provides in full that,

> It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152 First. Section 152 Seventh provides that "[n]o carrier, its officers or agents shall change the rates of pay, rules, or working conditions of its employees, as a class as embodied in agreements except in the manner prescribed in such agreements or in section 156 of·this title." 45 U.S.C. § 152 Seventh. Section 156, in turn, provides in relevant part that,

> In every case where such notice of intended change has been given ... rates of pay, rules, or working conditions shall not be altered by the carrier *until* the controversy has been finally acted upon as required by section 155 of this title, by the Mediation Board....

45 U.S.C. § 156 (emphasis added). It is uncontroverted that the services of the NMB, pursuant to 45 U.S.C. § 155, terminated as of November 17, 1993. Complaint, Ex. 12.

In order to determine whether plaintiffs have stated a cause of action upon which relief may be granted,[11] the court must de-

---

**11.** Although defendant styled its motion as one

for summary judgment, the first cause of action

termine what steps a party to a collective bargaining agreement may take after the NMB's services have been terminated. It is well-settled that following the statutory cooling off period, both parties may engage in peaceful self-help. *Burlington N. R.R. Co. v. Brotherhood of Maintenance of Way Employes,* 481 U.S. 429, 445, 107 S.Ct. 1841, 1851, 95 L.Ed.2d 381 (1987) ("[I]f the parties exhaust these [RLA] procedures and remain at loggerheads, they may resort to self-help in attempting to resolve their dispute, subject only to such restrictions as may follow from the invocation of an Emergency Board under § 10 of the RLA."); *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969) ("Implicit in the statutory scheme ... is the ultimate right of the disputants to resort to self-help—'the inevitable alternative in a statutory scheme which deliberately denies the final power to compel arbitration.'"); *Pan American World Airways, Inc. v. International Broth. of Teamsters,* 894 F.2d 36, 38 (2d Cir.1990) ("Once the 'cooling-off' period has expired without an agreement, the parties may then resort to economic force—absent appointment by the President of an Emergency Board[.]") (holding that under the RLA the union can commit work stoppage during self-help period following the cooling off period). What is not as clear, however, is the permissible scope that such self-help may take. "[T]he Act is wholly inexplicit as [to] the scope of allowable self-help." *Jacksonville,* 394 U.S. at 391, 89 S.Ct. at 1122.

█ If plaintiffs have alleged that Varig made changes in working conditions which are beyond the scope of permissible self-help, then the complaint would survive a Rule 12(b)(6) analysis and the court would look to outside materials to determine if there is a genuine issue of material fact. A review of the present state of the law, however, indicates that by implementing changes which were included in the Company's original section 6 notice, and by not implementing changes which "strike a fundamental blow to union or employer activity and the collective

bargaining process itself[,]" *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants,* 489 U.S. 426, 442, 109 S.Ct. 1225, 1235, 103 L.Ed.2d 456 (1989), Varig did not engage in impermissible self-help and hence plaintiffs' first cause of action fails to state a claim upon which relief can be granted.

In 1988, the Supreme Court of the United States affirmed by a 4–4 vote the decision of the Eighth Circuit in *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants,* 809 F.2d 483 (8th Cir.1987) ("*TWA*"), aff'd by equally divided court, 485 U.S. 175, 108 S.Ct. 1101, 99 L.Ed.2d 150 (1988), which held that a carrier may not institute unilateral changes in wages, or other terms and conditions of employment unless the proposed changes have been made the subject of a section 6 notice and RLA procedures. In *TWA,* the parties exchanged section 6 notices and proceeded to mediation under the supervision of the NMB. The company refused the NMB's offer of arbitration and the parties, once released by the NMB, were allowed to engage in self-help as of March 7, 1986. On that day the union struck the airline and the company implemented new working conditions, including abrogation of the union security and dues check-off provisions contained in their collective bargaining agreement. "These provisions were not the subject of a section 6 notice in which TWA sought changes in the collective bargaining agreement." *Id.* at 484.

In affirming the district court's granting of summary judgment to the union, the court held that the union security clause which was not the subject of the section 6 notice could not be altered. *Id.* at 485. Because the policy of the RLA is to encourage dispute resolution through mediation and negotiation, the court was concerned that,

An airline employer, such as TWA, may flout the entire purpose of the RLA by not filing a section 6 notice with regard to certain changes it intends to make. Under such circumstances, the carrier may hide

is more properly analyzed pursuant to Federal Rule of Civil Procedure 12(b)(6) because, even if the allegations contained in the complaint are

accepted as true, plaintiffs have not alleged a violation of the RLA upon which relief may be granted vis-a-vis this first cause of action.

its true intention to make certain changes so that the change is never negotiated and the NMB never has the opportunity to mediate the dispute. This leaves the carrier free to unilaterally change a condition of employment, here the extremely important condition of union security, without ever having to negotiate, mediate or arbitrate the dispute.

*Id.* at 492.

The court, relying on *Brotherhood of Railway & Steamship Clerks, Freight Handlers, Express & Station Employees, AFL–CIO v. Florida East Cost Railway Co.*, 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966) (*"FEC"*), stated that, "[t]he Supreme Court thus recognized that bargaining is central to the RLA and that even the existence of a strike does not empower management to annul those terms of the collective bargaining agreement that had not been subject to prior bargaining." *TWA*, 809 F.2d at 487. Any terms of the collective bargaining agreement which were not the subject of the section 6 notice and the RLA mediation provisions remain binding on the parties unless abrogation of those terms are necessary for the company's continued operation. *Id.* at 491 ("[I]f a working condition has not been subject to the procedures of the Act, it may not be changed even after expiration of the status quo period unless truly necessary for the continued operation of the airline.") (citing *FEC*, 384 U.S. at 248, 86 S.Ct. at 1425). Based on the policy considerations articulated by the Court in *FEC* and as stated in the RLA (*i.e.*, encouraging mediation, recogniz-

ing the public service nature of the business and the carrier's responsibility to the public to maintain the public service at all times), the court rejected the company's argument that upon the expiration of the cooling off period, all provisions of the collective bargaining agreement terminate. *Id.* at 485–91.[12] Because terms not included in the section 6 notice and subject to the RLA's mediation provisions survive the cooling off period, the company was not permitted to abrogate the union security and dues check-off provisions in the parties' collective bargaining agreement.

In this case, unlike the actions taken by the carrier in *TWA*, it is undisputed that Varig has not implemented any changes in rates of pay, rules, or working conditions which were not contained in Varig's section 6 notice. *Compare* Seham Aff'd, Ex. A ("Varig Proposals for Negotiations with IAMAW— [September 11,] 1992") *with* Complaint, Ex. 14 ("Implementation of Varig's Proposals [December 23, 1993]"). Both the September 11, 1992 list and the final list of implemented changes include, *inter alia*, changes to subcontracting and an elimination of Article XVIII (the union security clause). Plaintiffs do not dispute Varig's statement of undisputed fact that "[s]ubsequent to the completion of the thirty (day) cooling off period, the defendant has only unilaterally implemented changes in conditions of employment that were proposed in its original section 6 notice to defendants [sic]." Def.'s 3(g) Statement, ¶ 5.[13] Because Varig made no changes which

---

**12.** The court was also persuaded by the language in the collective bargaining agreement which, the court reasoned, *did not lend itself to an interpretation* that upon impasse the provisions of the agreement terminated, especially given the policy considerations which underlie the RLA and which were voiced by the Court in *FEC*. The duration clause in the collective bargaining agreement in *TWA* provided that the agreement "shall remain in effect until July 31, 1984 and thereafter shall renew itself without change for yearly periods unless written notice of intended change is served in accordance with Section 6, Title 1 of the Railway Labor Act, as amended by either party hereto, at least 90 days prior to the renewal date in each year." *Id.* at 484. Neither party in this action has argued that the collective bargaining agreement terminated upon a date certain. Because the duration clause in the Varig/IAM collective bargaining agreement is almost

identical to the clause cited in *TWA*, it is unlikely that such an argument would be dispositive. The durational clause in the Varig/IAM collective bargaining agreement provides that "[t]his agreement shall become effective September 1, 1988 and shall continue in full force and effect until August 31, 1992 and thereafter from year to year unless written notice of intended charge [sic] is served by either party in accordance with the provision of Section 6, Title I of the Railway Labor Act, as amended."

**13.** As noted above, the actual section 6 notices, dated July 17, 1992 and July 21, 1992, Complaint, ¶ 13, were not made part of the record. However, it is undisputed that the items contained in Varig's September 11, 1992 list include those items contained in its section 6 notice. *See* Seham Aff'd, ¶ 4 ("At the [September 16, 1992

were not included in its section 6 notice, plaintiffs' allegations—even if accepted as true—fail to state a cause of action upon which relief can be granted.

In *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 489 U.S. 426, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989), the Court held that a carrier could, during the self-help period, "discriminate against full-time strikers by giving preference to employees who crossed the picket line to return to work before the strike was over." *Id.* at 443, 109 S.Ct. at 1235–36 (Brennan, J., dissenting). In so holding, the Court had occasion to comment on the permissible scope of self-help following the cooling off period. Its observations are worth quoting at length:

> Here, TWA and the Union followed without interference the scheme of the RLA to an unsuccessful conclusion and then turned to self-help. We have more than once observed that, at this final stage of a labor dispute regulated by the RLA, "the Act is wholly inexplicit as to the scope of allowable self-help." Such silence does not amount to a congressional *imprimatur* on all forms of postnegotiation self-help. *It does, however, indicate that we should hesitate to imply limitations on all but those forms of self-help that strike a fundamental blow to union or employer activity and the collective bargaining process itself.* Accordingly, just as we saw no statutory basis for limiting the secondary activities of unions during a period of self-help ... we see no basis in § 2 Fourth for prohibiting the crossover policy employed by TWA once bargaining had reached an impasse. Both self-help measures fall squarely within the "full range of whatever peaceful economic power [the parties] can muster" once they have "unsuccessfully exhausted the Railway Labor Act's procedures for resolution of a major dispute...." *Neither measure prevented the scheme of the RLA from working; neither measure was inherently destructive of union or employer activity.*

*Id.* at 442, 109 S.Ct. at 1235 (citations omitted) (emphasis added).

In this case, Varig has only instituted those changes which the Union was on notice were subject to change during self-help because of their appearance in the Company's section 6 notice and its September 11, 1992 list of proposed changes. Implementation of Varig's changes and elimination of the union security clause does not "strike a fundamental blow to union ... activity and the collective bargaining process itself"; does not "prevent[] the scheme of the RLA from working"; and is not a "measure ... inherently destructive of union ... activity" precisely *because* the Union was on notice that if the parties could not reach a meeting of the minds, these changes were possible. The changes implemented by Varig do not impede the Union's ability to strike or attract new members, nor has it thwarted the RLA's mediation procedure; to the contrary, these changes are a direct result of the failure of the RLA's mediation procedure.

A useful comparison, in this regard, can be made to *Local Union 808, International Brotherhood of Teamsters v. P & W Railroad Co.*, 576 F.Supp. 693 (D.Conn.1983). In *Local Union 808*, the union alleged that the company had violated the RLA by unilaterally changing "train crew consists by withholding two scheduled cost-of-living allowances"; making changes in the terms and conditions of employment beyond those set forth in the section 6 notice, and by locking-out the plaintiff. The court denied the company's motion to dismiss because,

> A carrier's right to self-help is not boundless, however, and, *beyond imposing changes consistent with the Section 6 notice,* it is limited to action "reasonably necessary" to continue operations.

*Id.* at 701 (quoting *FEC,* 384 U.S. at 248–49, 86 S.Ct. at 1425–26) (emphasis added). The changes implemented by Varig in December of 1993 are "consistent with" the changes proposed in its section 6 notice and its September 11, 1992 list; they were, in fact, the

meeting] ... the Company referred the Union to its Section 6 opener and the long list of items which the Company would like to see changed.")

(referring to the September 11, 1992 list attached as Exhibit A to the Seham Affidavit).

exact changes proposed in its section 6 notice and its September 11, 1992 list.

Also instructive is *Independent Union of Flight Attendants v. Pan American World Airways, Inc.,* 624 F.Supp. 64 (E.D.N.Y. 1985) (*"IUFA"*). In that action the court rejected the union's proposition that following the statutory cooling off period the company may only engage in self-help to the extent that it is reasonably necessary for the continuation of its business. *Id.* at 66. In so holding, the court reasoned that issues which had progressed through the statutory bargaining procedures were open to change following the cooling off period:

> Any other interpretation would destroy the legitimate role the self-help provision plays in the RLA scheme, *i.e.,* "to allow parties who have unsuccessfully exhausted the Railway Labor Act's procedures for resolution of a major dispute to employ the full range of whatever peaceful economic power they can muster, so long as its use conflicts with no other obligation imposed by federal law." *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 392–93, 89 S.Ct. 1109, 1123–24, 22 L.Ed.2d 344 (1969). Thus, because the changes that are the subject of this dispute have proceeded through the bargaining procedure, it seems clear that Pan Am may lawfully implement those changes pursuant to its right to engage in economic self-help.

*Id.* Any item, therefore, contained in a party's section 6 notice may be implemented following the statutory cooling off period. *Equal Employment Opportunity Comm'n v. United Air Lines, Inc.,* 755 F.2d 94, 96 (7th Cir.1985) ("On January 28, 1979, the 'cooling off' period imposed by the [RLA] ended and United was free to put into effect any changes referred to in its section 6 notice.") (Posner, J.) (dicta).

The court in *IUFA* also made it clear that insubstantial allegations of bad faith bargaining cannot be used to thwart a party's statutory right to engage in legitimate self-help following the conclusion of the mediation proceedings:

> The union also argues that Pan Am bargained in bad faith, failed to uphold its

statutory obligation to 'maintain' the 1985 Agreement.... Upon hearing the testimony and reviewing the evidence it its entirety, however, I am not persuaded that the union is likely to succeed in proving that Pan Am acted in bad faith or with some illegal purpose. To the contrary, it is clear that both sides simply continue to engage in robust, bare-knuckled bargaining, as is evident from the union's attorney's comments at the hearing: .... Clearly, "a party does not violate its duty under the Act if it chooses to be adamant in its position." *REA Express, Inc. v. Brotherhood of Railway, Airline and Steamship Clerks,* 358 F.Supp. 760, 772 n. 43 (S.D.N.Y.1973).

*IUFA,* 624 F.Supp. at 66 n. 1. As discussed more fully below, because this Court has reached the conclusion, based upon a review of "the evidence in its entirety" that Varig was not bargaining in bad faith in violation of 45 U.S.C. § 152 First, the Union's allegation of bad faith bargaining is not a basis upon which this court may conclude that Varig's recourse to self-help in this action violates 45 U.S.C. §§ 152 First and Seventh, and 156. The evidence submitted by the Union in support of its allegations of bad faith bargaining is "merely colorable" and is not "significantly probative." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). Therefore, because summary judgment is appropriate on the second cause of action, the allegations contained therein cannot stand as a bar to a dismissal of the first cause of action.

Also instructive is *In re Continental Airlines Corp.,* 60 B.R. 466 (Bankr.S.D.Tex. 1986), decided before *TWA.* In *Continental,* the union brought a claim for damages stemming from the company's alleged violations of the RLA. The company had moved in the bankruptcy court to reject the collective bargaining agreements at issue based on the contention that they had expired since the parties had exhausted the RLA's mandatory mediation provisions. Originally, the court determined that several provisions of the agreements had not expired because the parties had not bargained to impasse over those provisions in the collective bargaining agree-

ments. The court summarized its position after the company moved to amend the court's earlier memorandum and order:

> This Court abandoned its earlier view that it was necessary to bargain to impasse as to each intended change in employment terms before implementing such changes. Rather, this Court held that under the [RLA] an employer can unilaterally implement changes once the employer "exert[s] every reasonable effort" in exhausting the bargaining and mediation procedures contained in section 6 of the RLA as to each intended change. This Court found that this standard permitted Continental to implement any change in employment terms that had been actually negotiated between the parties *or reasonably comprehended within Continental's pre-August 13 proposals,* provided, of course, that the parties had exhausted the statutory proceedings contained in section 6.

> \* \* \* \* \* \*

> [T]here is no basis for the IAM's claim that Continental violated the RLA by improperly changing certain provisions of the IAM contracts on August 13 since all of these changes had been subjected to the bargaining and mediation procedures of the RLA.

*Id.* at 468–69, 471 (emphasis added).[14] *Continental Airlines,* and the cases it relied upon, is of questionable authority given that it was decided before the Supreme Court affirmed *TWA.* However, both cases stand for the general proposition that after the completion of the RLA's bargaining and me-

diation procedures, a carrier is free to engage in economic, peaceful self-help so long as the changes implemented were contained in the section 6 notice and the parties either negotiated to an impasse or the implemented changes were "reasonably comprehended" by the union.[15] A further gloss was added by the Court in *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants,* 489 U.S. 426, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989), in that a carrier or union may not engage in self-help which "strike[s] a fundamental blow to union or employment activity and the collective bargaining process itself." *Id.* at 442, 109 S.Ct. at 1235. In this case, the changes implemented by Varig were all contained in its section 6 notice and its September 11, 1992 list of proposed changes, and the parties either negotiated to an impasse (*e.g.,* the issue of subcontracting) or the issue should have been reasonably comprehended by plaintiffs based on the contents of Varig's section 6 notice and its September 11, 1992 list of proposed changes, (*e.g.,* elimination of Article XVIII). As noted above, the changes implemented by Varig do not strike a blow to union activity and the collective bargaining process but are in fact a direct result of union activity and the collective bargaining process (*i.e.,* the inability of the parties to reach an agreement).

■ Plaintiffs argue, however, that the first cause of action states a claim upon which relief can be granted because "[o]n December 22, 1993, Varig unilaterally changed a fundamental working condition of its employees by eliminating the union secu-

---

**14.** The court also concluded "after reviewing the extensive evidence on the parties' bargaining history," that the company did not violate the RLA by bargaining in bad faith during the negotiations which proceeded the exhaustion of the RLA procedures. *Id.* at 471.

**15.** One of the authorities relied upon in *Continental Airlines, American Federation of Television and Radio Artists v. National Labor Relations Bd.,* 395 F.2d 622, 624 (D.C.C.1968), cited with approval this statement by the National Labor Relations Board: "[A]fter bargaining to an impasse, that is, after good faith negotiations have exhausted the prospects of concluding an agreement, an employer does not violate the [National Labor Relations Act] by making unilateral changes that are reasonably comprehended within his pre-impasse proposals." Although *Ameri-*

*can Federation* was a decision analyzing the National Labor Relations Act ("NLRA") and not the RLA, "courts may consult NLRA cases 'for assistance in construing the Railway Labor Act.'" *Association of Flight Attendants v. Horizon Air,* 976 F.2d 541, 544 (9th Cir.1992) (holding that district court did not err in referring to NLRA cases for examples of conduct constituting bad faith bargaining for purposes of the RLA) (quoting *Jacksonville,* 394 U.S. at 383, 89 S.Ct. at 1118). The Court in *Jacksonville* also cautioned, however, that the NLRA "cannot be imported wholesale into the railway labor arena. Even rough analogies must be drawn circumspectly, with due regard for the many differences between the statutory schemes." *Jacksonville,* 394 U.S. at 383, 89 S.Ct. at 1118.

rity clause [Article XVIII] from the collective bargaining agreement, even though that issue was not part of the set of proposals bargained over by the parties or comprised in the Company's final offer." Pls.' Mem. at 18. In other words, plaintiffs contend that following the statutory cooling off period, a carrier is only entitled to implement those changes (i) over which the parties specifically negotiated, or (ii) which were contained in the company's final offer. In this regard, plaintiffs rely almost entirely on *FEC.*

In *FEC,* the union demanded a wage increase and the RLA procedures proved fruitless. The union went on strike and the railroad hired replacement workers in violation of the collective bargaining agreement. The Court rejected the company's argument that the strike gave it the right to terminate the collective bargaining agreement in toto and held that,

> The carrier must respect the continuing status of the collective bargaining agreement and make only such changes as are truly necessary in light of the inexperience and lack of training of the new labor force or the lesser number of employees available for the continued operation.

*Id.* at 248, 86 S.Ct. at 1425. The Court based this conclusion on the following:

> Were a strike to be the occasion for a carrier to tear up and annul, so to speak, the entire collective bargaining agreement, labor-management relations would revert to the jungle. A carrier could then use the occasion of a strike over a simple wage and hour dispute to make sweeping changes in its work-rules so as to permit operation on terms which could not conceivably have been obtained through negotiation.

*Id.* at 247, 86 S.Ct. at 1425. Plaintiffs argue, therefore, that based on the reasoning of *FEC,* Varig should not be allowed to make changes in those terms of conditions which

were not specifically negotiated prior to the cooling off period or which were not included in the Company's final offer. Varig has not contested plaintiffs' statement that "[t]he defendant did not bargain over, submit to mediation, or arbitrate numerous working conditions that it subsequently imposed on its employees, including the elimination of those employees' contractual union security clause." Pls.' 3(g) Statement, ¶ 5.

Plaintiffs' reliance on *FEC,* however, goes too far. The central concern of the Court in *FEC* was the contention by the carrier that a strike gives it (the carrier) the right to terminate in toto the collective bargaining agreement and replace it with any terms it deems appropriate. This is not the case before the court. Here, it is undisputed that the Union was provided with an extensive section 6 notice, thus putting it on notice that a myriad number of issues were on the table and that, should the RLA's mediation provisions prove unsuccessful, self-help would be available.[16] There is nothing in either the statute or the cases interpreting the statute which posits that only those issues which were specifically discussed or which were included in the company's final offer are candidates for self-help following the end of the cooling off period.[17] Nor should that be the case. The RLA is concerned with balancing, on the one hand, the desire to have the carrier settle its disputes with the union via mediation, *TWA,* 809 F.2d at 486 ("To enable the parties to a collective bargaining agreement to attain these goals [of the RLA], Congress has established mandatory, and 'almost interminable,' procedures which must be followed in settling disputes such as exist here."), and, on the other hand, providing the carrier with the option of making those changes it deems necessary, within certain limits, if the mandatory system of mediation has failed, *cf. FEC,* 384 U.S. at 246, 86 S.Ct. at 1424 ("But when

---

**16.** The Court has observed that it is the very threat of self-help which can bring the parties to agreement. *Burlington N. R.R. Co. v. Brotherhood of Maintenance of Way Employes,* 481 U.S. 429, 451–52, 107 S.Ct. 1841, 1854–55, 95 L.Ed.2d 381 (1987) (the availability of self-help rather than judicial remedies "may increase the effectiveness of the RLA in settling major disputes by creating an incentive for the parties to

settle prior to exhaustion of the statutory procedures.").

**17.** In fact, in *IUFA,* 624 F.Supp. 64 (E.D.N.Y. 1985), the court held that the company's right to self-help was not restricted to what the union interpreted were the terms of the company's final offer (an agreement allegedly reached between union and company).

a strike occurs, both the carrier's right to self-help and its duty to operate, if reasonably possible, might well be academic if it could not depart from the terms and conditions of the collective bargaining agreement without first following the lengthy course the Act otherwise prescribes."). If the Union's position is accepted, then Varig must return to the mediation table after more than one year of protracted negotiations thus defeating one of the purposes of the RLA's statutory scheme (*i.e.*, a resort to self-help following the cooling off period). "Such an extravagant interpretation would delay indefinitely the company's right to self-help and 'would result in an endless revolving door process.'" *IUFA*, 624 F.Supp. 64, 67 (E.D.N.Y.1985) (quoting *REA Express, Inc. v. Brotherhood of Ry., Airline and Steamship Clerks*, 358 F.Supp. 760, 770 (S.D.N.Y.1973)). The balance articulated above is best struck by the rule announced in *TWA* and affirmed by an equally divided Court: A carrier may make any change during the self-help period so long as those changes were included in the carrier's section 6 notice and the parties proceeded through the RLA's mediation procedure. This is in accord with the previous statement by the Court that a party, following the cooling off period, may access "the *full range* of whatever peaceful economic power [the parties] can muster[.]" *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 392, 89 S.Ct. 1109, 1123, 22 L.Ed.2d 344 (1969) (emphasis added). As noted earlier, it is often the availability of self-help which creates an incentive for settling disputes without judicial interference. *Burlington N. R.R. Co. v. Brotherhood of Maintenance of Way Employes*, 481 U.S. 429, 451–52, 107 S.Ct. 1841, 1854–55, 95 L.Ed.2d 381 (1987). This incentive takes on an even greater role if self-help is available as to all items embraced in a party's section 6 notice. This conclusion, of course, does not leave the Union without recourse; pursuant to the statutory framework, it is also free to engage in peaceful self-help following the termination of the thirty-day cooling off period.

In sum, because it is undisputed that the changes implemented by Varig in December of 1993 were included in its section 6 notice

and its September 11, 1992 list of proposed changes, and the parties exhausted the mandatory mediation procedure of the RLA, Varig did not, as a matter of law, violate 45 U.S.C. §§ 152 First and Seventh, and 156. In light of the foregoing, applying the principles the court deems controlling to the facts which are not in dispute, the defendant's motion is granted as to the first cause of action.

### III. *The Second Cause of Action*

■ Plaintiffs' second cause of action alleges a violation of 45 U.S.C. § 152 First. This provision of the RLA imposes a general duty on rail and air carriers and their employees to:

> exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152 First. The directive to "exert every reasonable effort to make ... agreements" is "a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis." *Chicago & N.W. Ry. Co. v. United Transp. Union*, 402 U.S. 570, 577, 91 S.Ct. 1731, 1735, 29 L.Ed.2d 187 (1971) (holding that federal district courts have jurisdiction to enforce Section 152 First). The Court has also stated that this statutory obligation is at "[t]he heart of the Railway Labor Act[,]" *Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 377, 89 S.Ct. 1109, 1115, 22 L.Ed.2d 344 (1969), and that, as with the duty to bargain in good faith as mandated by the NLRA, "[t]he bargaining status of a union can be destroyed by going through the motions of negotiating almost as easily as by bluntly withholding recognition." *Chicago & N.W.*, 402 U.S. at 575, 91 S.Ct. at 1734 (quoting Cox, *The Duty to Bargain in Good Faith*, 71 Harv.L.Rev. 1401, 1412–13 (1958)). The obligation codified in Section 152 First is not, therefore a "mere statement of policy or exhortation." *Summit Airlines, Inc. v.*

*Teamsters Local Union No. 295,* 628 F.2d 787, 790 (2d Cir.1980) (quoting *Chicago & N.W.,* 402 U.S. at 577, 91 S.Ct. at 1735).

■ Examples of actions which can form the basis of a violation of the RLA therefore include an unwillingness to "meet and confer with the authorized representatives of its employees, to listen to their complaints, [and] to make reasonable effort to compose differences[.]" *Virginian Ry. Co. v. System Fed'n No. 40,* 300 U.S. 515, 548, 57 S.Ct. 592, 599, 81 L.Ed. 789 (1937). In confirming the district court's determination that the company had violated Section 152 First, the Ninth Circuit in *Association of Flight Attendants v. Horizon Air,* 976 F.2d 541, 545 (9th Cir. 1992), noted that,

> To determine whether the parties have engaged in reasonable efforts to reach an agreement or merely gone through the motions, some inquiry into the substance of the negotiations is inescapable, not to weigh the reasonableness of the proposals but only to determine whether they were of such a nature as to indicate an intention not to reach an agreement at all.

As one commentator has noted, "[c]ourts will closely scrutinize claims of failure to bargain in good faith in connection with suits to enjoin strikes or unilateral carrier action." 9 T. Kheel, *Labor Law* § 50.05[3] at 50–34 (1992).

■ In endeavoring to make the determination as to whether a party to a collective bargaining agreement failed to "exert every reasonable effort to make ... agreements," the court, as with any allegation of bad faith, must look to the intent of the parties and base its decision on the totality of the evidence. *Railway Labor Executives' Ass'n v. Boston & Maine Corp.,* 664 F.Supp. 605, 615 (D.Me.1987) (in analyzing claims of bad faith bargaining court must "evaluate the totality of the Railroads' conduct since bad faith must usually be inferred from circumstantial evidence.... The controlling determination in these bad faith bargaining claims is the subjective intent of both parties.") Here, the parties have provided the court with an extensive record of their bargaining positions and affidavits regarding the negotiations, and therefore a determination of this claim pursuant to a motion for summary judgment is appropriate because the court has before it "the totality of the [Company's] conduct."

■ In this case, an examination of the undisputed facts as they relate to the year-long process of negotiations between these parties demonstrates beyond per adventure that no rational trier of fact could conclude that Varig was bargaining in bad faith, and hence summary judgment is appropriate. A close examination of the chronology and the proposals and counterproposals, as set forth in the Complaint, bears this out:

● *July 1992.* The parties exchange section 6 notices pursuant to the provisions of the RLA. Complaint, ¶ 13.

● *September 1992.* The parties exchange their lists of proposed changes to the collective bargaining agreement. Complaint, ¶ 13; Exs. 1, 2. Both lists cite many provisions in the collective bargaining agreement. Both parties spread their respective nets wide.

● *September 1992 to December 1992.* There is a hiatus of three months. During this time, in November of 1992, the IAM notifies Varig that District Lodge 142 has replaced District Lodge 100 as the bargaining agents for Varig employees. Complaint, ¶ 14. The Union does not allege that this break in negotiations was due to Varig's unwillingness to negotiate nor has it challenged Varig's statement that "[t]he Company repeatedly asked Union representatives when meetings would be resumed." Seham, Aff'd, ¶ 6.

● *December 1992.* Negotiations resume on December 16, 1992 and the Union is informed that Varig will present a shortened list of proposals for changes in the collective bargaining agreement. Complaint, ¶ 15.

● *January 1993.* The parties meet again on January 13 and 14, 1993. Seham Aff'd, ¶ 7. The Company reduces its proposed changes to five issues: duration, supplemental pension plan, wage scale, medical coverage, and subcontracting. Complaint, Ex. 3. The proposal expires by its own terms on February 13, 1993. Complaint, Ex. 3, at 1.

● *February 1993.* On February 9, 1993, Varig seeks mediation with the NMB stating

that "[t]he IAM refused to proceed with a scheduled Negotiation Session for 2/10/93 claiming unavailability of certain negotiators for scheduled negotiation." Seham Aff'd, Ex. C. Although the Union opposed the request for mediation, Roach Decl., ¶ 6, the Union conceded at oral argument that once the NMB received Varig's request for intervention, it had no choice but to assign a mediator, which it did on February 10, 1993. Complaint, Ex. 4.

- *February 1993 to April 1993.* During this period there is another hiatus of negotiations between the parties. The Union does not contend that this break was attributable to the actions of Varig.

- *April 1993.* On April 14, 1993, Varig submits a seven point proposal: wage rates, duration, medical coverage, subcontracting, seniority, holidays, and reduction in "starting and limit progression" for those hired after the revised collective bargaining agreement is in effect. On April 19, 1993, Varig adds an eighth point: elimination of Article XII(e) of the collective bargaining agreement (designation of broker of record for the employees' insurance and pension plans). During the period of April to July, 1993, the parties met for three two-day sessions. Complaint, ¶ 17.

- *June 1993.* On June 9, 1993, Varig adds another proposal to the equation regarding cost savings measures for the Miami Cargo Department. Complaint, Ex. 7.

- *June 1993 to August 1993.* In June and August, 1993, the Union submits counterproposals which are rejected. Complaint, Exs. 8, 9; Complaint, ¶ 18. These proposals are "predicated on the Company's withdrawing any proposals dealing with subcontracting of work other than what is in the present collective bargaining agreement." Complaint, Ex. 8.

- *August 1993.* On August 6, 1993, Varig writes to the NMB requesting that it

terminate its efforts to mediate negotiations between the parties. Complaint, ¶ 18. The Union objects to termination, Complaint, Ex. 11, and the mediation process continues.

- *September 1993.* At the request of the NMB, Varig submits its "final proposal" dated September 7, 1993, which includes the following items: duration, wage increase and reduction, medical coverage, limit of agents in Cargo Department, subcontracting, Cargo Automation Program, and Technical Maintenance. Complaint, Ex. 10. Varig objects to the cancellation of mediation sessions scheduled for September 10 and 11, 1993, in its letter to the NMB, dated September 9, 1993. Seham Aff'd, Ex. G.[18] In its letter of September 17, 1993, the Union opposes the Company's August 6, 1993 request to end mediation and asks that the NMB admonish Varig to bargain in good faith. Complaint, Ex. 11. The record is devoid of any such admonition by the Board.

- *September 1993 to October 1993.* The parties continue to meet. Complaint, ¶ 21. On October 18, 1993, Varig again opposes any further adjournments of scheduled mediation sessions. Seham Aff'd, Ex. H.[19]

- *November 16, 1993.* The parties continue to meet during the period of October through December, 1993, Complaint, ¶ 22, and on November 16, 1993, Seham and O'Driscoll have a "side meeting" to discuss terms of a new collective bargaining agreement. Complaint, ¶ 22.

- *November 17, 1993.* The NMB confirms that it has been released from mediation and that the parties have declined arbitration.

- *December 1993.* During the month of December 1993, the following occurs:

  - The parties meet on December 8, 1993, during the cooling off period. Complaint, ¶ 24.

---

**18.** In its Complaint, the Union alleges that "[o]n September 9, 1993, the Company again wrote the NMB to suggest that the NMB should end it [sic] mediation efforts." Complaint, ¶ 20. This letter makes no such request; rather, it expresses "shock" that the scheduled mediation sessions may be adjourned.

**19.** In its Complaint, the Union alleges that on October 18, 1993, Varig "again wrote the NMB requesting that it terminate its services." Complaint, ¶ 21. The October 18, 1993 letter from Varig to the NMB, however, does *not* request a termination of its services; on the contrary, it opposes any further delay or adjournments.

- On December 10, 1993, the Union delivers its written proposals based on the "side meeting" which took place on November 16, 1993. Its terms differ from the agreement the Union claims was reached on November 16, 1993. *See* O'Driscoll Decl., unnumbered exhibit.

- On December 17, 1993, Varig rejects the Union's proposals. Complaint, ¶ 25.

- Varig submits its "Final Position Statement," Roach Decl., Ex. B, which includes a total of ten items, including, *inter alia,* duration, subcontracting, and elimination of broker of record. The Union agrees to put the final proposal to a vote.

- The parties meet again on December 20, 1993, and the Union informs Varig that it will vote the final proposal on December 28, 1993. Complaint, ¶ 28.

- The Company posts its notice on December 24, 1993. Complaint, Ex. 13.

- The Union receives Varig's December 23, 1993 notice of implementation on December 27, 1993. Complaint, Ex. 14.

- The Union membership declines to ratify the Company's final offer. Roach Decl. ¶ 32.

\* \* \* \* \* \*

■ The undisputed facts in this action, as set forth above, demonstrate that these parties participated in tenacious, aggressive bargaining. However, as the courts have made clear on several occasions, a party does not violate the RLA by remaining steadfast in its position. *IUFA,* 624 F.Supp. 64, 66 n. 1 (E.D.N.Y.1985) (finding no violation of duty to bargain in good faith where "it is clear that both sides simply continue[d] to engage in robust, bare-knuckled bargaining . . . ."); *REA Express, Inc. v. Brotherhood of Ry., Airline and Steamship Clerks,* 358 F.Supp. 760, 772 n. 43 (S.D.N.Y.1973) ("a party does not violate its duty under the Act if it chooses to be adamant in its position."). In this regard, it is significant that Varig included in *each and every* proposal that changes in subcontracting were essential to the consummation of a new agreement. The documentation also makes clear that the Union was equally adamant that there should be *no* changes whatsoever to the subcontracting provisions of the collective bargaining agreement. *See, e.g.,* Complaint, Ex. 8 ("The following Union Proposal of Settlement is predicated on the Company's withdrawing any proposals dealing with subcontracting of work other than what is in the present collective bargaining agreement."). As the court in *Horizon* noted, "[c]ourts must resist finding violations of the RLA based solely on evidence of hard bargaining, inability to reach agreement, or intransigent positions." *Horizon,* 976 F.2d at 545. In this case the record demonstrates that the parties failed to reach an agreement, not because of illegal actions by the Company, but because there was no meeting of the minds vis-a-vis key provisions of the collective bargaining agreement. Based on a review of the record as a whole, no reasonable jury could find otherwise.

As cases such as *IUFA, REA Express,* and *Horizon* make clear, the Railway Labor Act outlaws bad faith bargaining; it does not, however, impose a barrier to "robust, bare-knuckled" bargaining. A comparison to the actions by the company in *Horizon,* where the Ninth Circuit affirmed a finding of bad faith bargaining, illustrates the extent to which Varig's actions cannot be characterized as violative of the RLA. In *Horizon,* the district court found that the company "displayed a general attitude of hostility"; attempted to "frustrate the negotiations schedule" by "refusing to release flight attendants for negotiations and insisting on scheduling infrequent negotiating sessions"; made derogatory statements regarding the negotiating process during the negotiations; sought to bargain directly with union members in violation of the RLA; and made contract proposals "which it knew were so consistently and predictably unpalatable to the [union] so as to show that Horizon intended that the parties not reach agreement." *Id.* at 545–46. In marked contrast, the undisputed facts in this action demonstrate that Varig was not hostile to the statute's negotiation and mediation provisions. To the contrary, the record establishes that the Company continually sought to avail itself of the statute's provisions for mediation and negotiation, and, in fact, protested on at least two separate occa-

sions when scheduled mediation sessions with the Union and the NMB were to be postponed. *See* Seham Aff'd, Exs. G and H. Furthermore, rather than making contract proposals which were "consistently and predictably unpalatable," the Company actually *reduced* its initial demands from a broad-based request for changes in numerous provisions of the collective bargaining agreement, Seham Aff'd, Ex. A, to a more focused and limited proposal, Seham Aff'd, Ex. B. As noted above, there is no violation of the RLA if a party remains wedded to a position which it believes is crucial, and therefore the fact that the Company continued to insist in changes to subcontracting is not evidence of bad faith bargaining. This is especially so given the fact that Union opposes the Company's right to accept pre-palletized cargo under the provision of the collective bargaining agreement that prohibits subcontracting, while at the same time it concedes to such requests by Varig's competitors whose employees are also represented by the IAM. O'Driscoll Decl., ¶ 13.

The facts establish that the parties met, bargained for over a year, failed to reach an agreement, and were then released from their statutory obligations. The stance of an unflinching adversary cannot, and should not, result in liability for bad faith bargaining in violation of 45 U.S.C. § 152 First. In this regard, the words of the court in *Independent Federation of Flight Attendants v. Trans World Airlines, Inc.*, 682 F.Supp. 1003, 1019 (W.D.Mo.1988), *aff'd*, 878 F.2d 254 (8th Cir.1989), *cert. denied*, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990), are particularly apt:

> Never before this case has a court been asked to examine, at the behest of a union, a scenario of bargaining sessions, for the purpose of finding an employer violation of the bargaining law and imposing on the employer the severe sanctions rather frequently applicable to an "unfair labor practice strike" under the NLRA.

So too in the case before this court: The rough-and-tumble of a year-long series of bargaining sessions cannot form the basis of a violation of the RLA's imperative to bargain in good faith.

*The November 16, 1993 "Agreement"*

In opposition to the Company's motion for summary judgment, the Union places great reliance on the "agreement in principle" which the parties allegedly reached on November 16, 1993. *See* Complaint, ¶ 22. The thrust of plaintiffs' argument is that a trier of fact could determine that the parties reached an agreement and that based upon that agreement the Union and the Company jointly requested that the NMB end its mediation efforts so that the Company could hasten the end of the statutory mediation provisions and thus allow it to legally implement its section 6 and September 11, 1992 changes, thus demonstrating its intent not to "exert every reasonable effort to make ... agreements." 45 U.S.C. § 152 First. This allegation, however, is unpersuasive for several reasons.

First, the record establishes that no agreement was reached between the two parties on November 16, 1993. It is undisputed, for example, that the understanding which the Union alleges was reached was never reduced to writing. It was, at the very most, an agreement to agree because, as the Union concedes, no terms of the agreement were ever fixed. There were, for example, several inconsistencies between the agreement alleged by O'Driscoll in his declaration and the items submitted by the Union on December 10, 1993, for inclusion in the proposed final, written agreement.

In his "second supplementary affidavit" dated May 16, 1994 ("May 16, 1994 Seham Aff'd"), Seham agrees that the O'Driscoll declaration "correctly characterizes the nature of the dialogue [on November 16, 1993]; O'Driscoll at this juncture exclusively addressed alternative means of obtaining the necessary cost reductions." May 16, 1994 Seham Aff'd, ¶ 4. Seham points out, however, that "the December 10 written proposal [of the Union], delivered over three weeks after this discussion, included significant changes in the grievance procedure and System Board of Adjustment that the Union had been seeking." May 16, 1994 Seham Aff'd, ¶ 4. Some of the other differences between the agreement alleged in the complaint and in the Union affidavits versus the items listed

by the Union in its written proposal three weeks later, are as follows.

| November 16, 1993 "Agreement" | December 10, 1993 Proposal |
| --- | --- |
| • New entry level wage for new hires in the cargo department would start at $7.00/hour, rather than the current contract rate of $9.82/hour, and continue on a reduced track. O'Driscoll Decl., ¶ 10. | • New hire wage rates to exceed the existing pay scale for current employees after the 24th month (Month No. 6 at $7.00/hour; Month No. 120+ at $18.63/hour). |
| • To solve theft problem, Union agrees to "implement a system of control wherein management supervisors would be able to verify all air freight counts on delivery and pick-up." O'Driscoll Decl., ¶ 12. | • No proposal regarding protection against theft. |
| • Union proposes to settle an arbitration award regarding the Company's right to accept prepalletized cargo under the provision of the contract that prohibits subcontracting. O'Driscoll Decl., ¶ 13. | • No proposal regarding settlement of arbitration award. |
| • O'Driscoll "indicate[s] the union's willingness to agree to eliminate the 'Broker of Record' for Life and Health Insurance, and Pension Plan...." O'Driscoll Decl., ¶ 11. | • No proposal regarding the Broker of Record. |
| • Union states that it is willing to sign a short-term contract. O'Driscoll Decl., ¶ 13. | • No proposal regarding duration. |

Because the plaintiffs' written proposal differs from the Union's version of the oral agreement allegedly reached on November 16, 1993, it is an undisputed fact that there was no meeting of the minds on that date and therefore no "agreement" was reached. As a matter of law, "an obligation to sign a collective-bargaining agreement arises only if a meeting of the minds on all material terms has occurred." *Raytown United Super*, 287 N.L.R.B. 1155, 1988 WL 213656 at *1 (1988). As demonstrated above, there was no agreement between Varig and the Union on November 16, 1993, regarding *any* material terms. The court in *IUFA*, 624 F.Supp. 64, 67 (E.D.N.Y.1985), was also faced with a situation wherein one of the negotiating parties alleged that an agreement had been reached. In rejecting that assertion, the court could have been describing the November 16, 1993 "agreement" proposed by the Union in this action:

> If there is no agreement upon all the terms, there is no 'Agreement.'

> It is, therefore, not at all clear to this Court that the parties have, in fact, reached an agreement. As a practical

matter, the union's claims should not be adjudicated until the NMB has issued a definitive ruling on the bedrock question: is there an agreement? Clearly, Congress intended disputes concerning interpretation of mediated agreements to lie within the jurisdiction of the NMB. *Cf. Brotherhood of Locomotive Engineers v. Missouri–Kansas–Texas Railroad Co.*, 320 U.S. 323, 332 n. 7, 64 S.Ct. 146, 150 n. 7, 88 L.Ed. 76 (1943). Judicial review of the IUFA's claims is not proper at this time. *Id.* at 67.

The Second Circuit has also recently articulated the common law maxim that "if the parties did not intend to become bound by the agreement until it was in writing and signed, then there was no contract until and unless that event occurred." *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 97 (2d Cir.1994). The same is true in the case before the court: The lack of an agreement as to any material terms and the Union's concession that the parties intended to memorialize their alleged understanding at a latter date, belie the contention that the parties reached an "agreement" on November 16, 1993. The "agreement," therefore, cannot be the basis for the assertion that the Company was bargaining in bad faith in violation of 45 U.S.C. § 152 First.

Moreover, it is simply incredible that Varig would, as O'Driscoll alleges, drop the central pillar of its position—*i.e.*, its subcontracting proposals—after months of extensive negotiations, especially given the fact that *every single proposal* by the Company, up until this time, had included a provision for subcontracting. Based upon all of the submissions, and the entire record, the assertion that Varig dropped the subcontracting proposal that it had been insisting upon for over a year defies belief and this court concludes that no rational trier of fact could find otherwise. This conclusion is buttressed by the fact that if the broad outlines of an agreement had been reached between Messrs. O'Driscoll and Seham, but the details needed to be worked out (as the Union alleges), then rather than agreeing to release the NMB, the NMB would have been the logical vehicle for assisting the parties.

In their complaint, plaintiffs also point to the following items which, they allege, are indicative of the Company's intent not to reach an agreement with the Union in violation of Section 152 First, and require denying the Company's motion for summary judgment: (i) premature requests to the NMB seeking mediation; (ii) refusal to meet during the thirty-day cooling off period; (iii) breach of a promise to maintain the status quo pending the employee vote on the company's final offer; and (iv) its implementation of terms, such as Article XVIII (union security clause), which were not the subject of the negotiation process. Complaint, ¶ 36. These assertions are meritless within the context of the undisputed facts outlined above and can be dealt with quickly.

■ 1. *Premature Request for NMB Mediation.* Plaintiffs allege that an indication of the Company's violation of 45 U.S.C. § 152 First is the Company's decision to seek mediation early in the negotiating process. Roach Decl., ¶ 6 ("On February 9, 1993, after only four days of bargaining over their proposal, the Company applied for mediation services from the [NMB]. Although the IAM opposed this premature resort to mediation, the [NMB] announced that it would assign a mediator to mediate this dispute.").[20] However, as noted above, the Union conceded at oral argument that the NMB had no choice but to accept the Company's request for mediation. Furthermore, the statute specifically entitles *any party* to request the NMB's services in order to help resolve disputes in the airline industry. It would be ironic indeed if the Company could be found by a trier of fact to be in violation of the statute by the very act of complying with the statute. Moreover, the court is required to

examine the totality of the evidence in any cause of action alleging bad faith bargaining in violation of 45 U.S.C. § 152 First. *Railway Labor Executives' Ass'n v. Boston & Maine Corp.,* 664 F.Supp. 605, 615 (D.Me. 1987). In this regard, the request for mediation which took place at the beginning of a year-long negotiation and mediation process is not indicative of an intent not to "exert every reasonable effort to make ... agreements," 45 U.S.C. § 152 First.

2. *Refusal to Meet From December 13 to 17, 1993.* The Union alleges that the Company refused to meet during the period of December 13 to 17, 1993, while the cooling off period was in progress. Complaint, ¶ 25. The fact of the matter is, however, that it is undisputed that the Company *did* meet during the cooling off period; therefore it cannot be said that the Company displayed an unwillingness to "meet and confer with the authorized representatives of its employees...." *Virginian Ry. Co. v. System Fed'n No. 40,* 300 U.S. 515, 548, 57 S.Ct. 592, 599, 81 L.Ed. 789 (1937). Furthermore, 45 U.S.C. § 155 First does not impose an obligation on the parties to continue to meet during the thirty-day cooling off period. The statute's only directive to the parties during this period is that "no change shall be made in the rates of pay, rules, or working conditions or established practices in effect prior to the time the dispute arose." 45 U.S.C. § 155 First. It is undisputed that Varig made no effort to change the rates of pay, rules, or working conditions during the thirty-day cooling off period.

■ 3. *Commitment to Maintain the Status Quo.* Only the NMB has jurisdiction to hear disputes regarding the interpretation or application of an agreement reached between a union and a company, *IUFA,* 624

---

**20.** Varig argues that, even if accepted as true, this allegation cannot form the basis of a violation of 45 U.S.C. § 152 First because the request for mediation occurred on February 9, 1993, and is therefore outside of the six-month statute of limitations period of this statute. *Robinson v. Pan American World Airways, Inc.,* 777 F.2d 84, 89 (2d Cir.1985). However, as explained by the Ninth Circuit in *Horizon Air,* 976 F.2d at 547–48:

A party may not rely solely on events occurring more than six months before suit was filed to establish a violation of the RLA. *Local*

*Lodge No. 1424, Int'l Ass'n of Mach., AFL–CIO v. NLRB,* 362 U.S. 411, 416–20, 80 S.Ct. 822, 826–28, 4 L.Ed.2d 832 (1960). However, events occurring outside the limitations period may be proven "to shed light on the true character of matters occurring within the limitations period," *id.* at 416, 80 S.Ct. at 826, if evidence exists that is "reasonably substantial in its own right" that the violation of the RLA upon which the plaintiff relies occurred within the period. *NLRB v. MacMillan Ring–Free Oil Co.,* 394 F.2d 26, 33 (9th Cir.1968).

F.Supp. 64 (E.D.N.Y.1985), and, therefore, this court lacks jurisdiction to entertain an allegation that Varig breached a promise to maintain the status quo pending the union vote on the Company's final proposal. Moreover, the undisputed facts outlined above demonstrate that far from attempting to thwart the consummation of a new bargaining agreement, Varig was, throughout the process, attempting to bring the Union *back* to the mediation table. An alleged violation of a promise to retain the status quo pending the Union vote on the Company's final proposal is not, within the context of the totality of the record, evidence of bad faith bargaining.

4. *Implementing Terms Not Included in the Company's Final Offer.* As demonstrated above, it is not a violation of 45 U.S.C. §§ 152 First and Seventh, and 156 to implement terms which were included in a party's section 6 notice. *TWA,* 809 F.2d 483 (8th Cir.1987), *aff'd by equally divided court,* 485 U.S. 175, 108 S.Ct. 1101, 99 L.Ed.2d 150 (1988). Legally resorting to self-help cannot, therefore, be a basis upon which a reasonable jury could conclude that Varig was acting in bad faith in violation of 45 U.S.C. § 152 First.

■ With regard to the factual allegations upon which the Union contends Varig violated its obligation to "exert every reasonable effort to make ... agreements," 45 U.S.C. § 152 First, the Court has stated that "[t]he policy of the Railway Labor Act was to encourage use of the nonjudicial processes of negotiation, mediation and arbitration for the adjustment of labor disputes." *Brotherhood of R.R. Trainmen v. Toledo, P. & W. R.R.,* 321 U.S. 50, 58, 64 S.Ct. 413, 418, 88 L.Ed. 534 (1944). Judicial intervention in the mediation and negotiating process is therefore disfavored. *International Broth. of Teamsters v. Pan American World Airways, Inc.,* 716 F.Supp. 726, 734 (E.D.N.Y.1989) (court is not required to force company to produce employee-related information pursuant to 45 U.S.C. § 152 First because "[s]uch a heightened judicial role in the collective bargaining process is at odds with the general statutory scheme of the RLA."). The Court in *Chica-*

*go v. N.W. R.R. Co. v. United Transportation Union,* 402 U.S. 570, 579 n. 11, 91 S.Ct. 1731, 1736 n. 11, 29 L.Ed.2d 187 (1971), stated that there is a "strong federal labor policy against governmental interference with the substantive terms of collective bargaining agreements." Denial of the Company's motion for summary judgment based on these separate allegations of bad faith bargaining, and a later application for the injunctive relief sought in the Union's Complaint, would run afoul of these directives; it would thrust the court into the collective bargaining process itself; and it would result in a failure of assuring that "neither party will be able to enlist the courts to further its own partisan ends." *Trans World Airlines, Inc. v. Independent Fed'n of Flight Attendants,* 489 U.S. 426, 441, 109 S.Ct. 1225, 1234, 103 L.Ed.2d 456 (1989).

\*    \*    \*    \*    \*    \*

As noted above, "[w]here a record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial[,]'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986), and summary judgment is appropriate. In this case, taking all of the evidence as a whole, and drawing all reasonable inferences in favor of the union, the record establishes a very simple fact: These parties were not able to arrive at a mutually satisfactory agreement after over one year of negotiation and mediation. Regarding the facts brought forward by the Union in support of its second cause of action, at the very most, "the evidence is merely colorable ... [and] is not significantly probative," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (citations omitted), and do not therefore pose a serious bar to granting summary judgment.

The failure to reach an agreement is not evidence that Varig lacked the intent to "exert every reasonable effort to make ... agreements ... and to settle all disputes ... in order to avoid any interruption to commerce...." 45 U.S.C. § 152 First. Rather, as the numerous proposals, counter-proposals, meetings, re-scheduled meetings, and

continued negotiations even during the cooling off period demonstrate, Varig made more than "reasonable" efforts to make an agreement. No reasonable jury could find otherwise and hence summary judgment in favor of the Company is appropriate.

## IV. *The Third Cause of Action*

■ Plaintiffs allege in their third cause of action a violation of 45 U.S.C. § 152 Third and Fourth. Section 152 Third provides in relevant part that "[r]epresentatives . . . shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other[.]" 45 U.S.C. § 152 Third. Section 152 Fourth provides in relevant part that,

> [I]t shall be unlawful for any carrier to interfere in any way with the organization of its employees . . . or to influence or coerce employees in an effort to induce them to join, or remain or not to join or remain members of any labor organization[.]

45 U.S.C. § 152 Fourth.

Plaintiffs allege a violation of these provisions of the RLA by reason of a notice which was posted by Varig on or about December 24, 1993. Complaint, Ex. 13. This notice reads in full as follows:

### NOTICE TO VARIG EMPLOYEES

Some of our employees have asked whether the union can legally retaliate against them for crossing a picket line.

By copy of this letter to the union, we are advising that organization of the implementation of our proposal to eliminate ARTICLE XVIII—UNION SECURITY. Among other things, it deletes any membership obligation by force of the labor contract.

If you want to terminate any further union obligation, you may also want to send a letter of resignation. Such a letter may be very brief and simply state that: "I, (name), do hereby resign from membership in the International Association of Machinists and any of its lodges and divisions or affiliates, effective immediately." The decision to take any of these steps is entirely up to you and will not be the basis of any form of retribution by the Company against you.

(bold and underscoring in original).

Plaintiffs allege that this notice was designed to intimidate and coerce Union members to resign their membership with the organization. Roach Decl., ¶ 29 (because the notice states that the decision to cross a picket line and resign from the Union is "up to you," "[t]hat is like saying, 'get in the car and come with me and I won't hurt you'—the implication of what will happen if you decide *not* to take any of the Company's suggested steps was clear—especially in light of its December 15 posting.") (emphasis in original).[21] The Company, on the other hand, contends that this notice was posted in response to threats made by the Union during the thirty-day cooling off period and was issued in response to Union members' inquiries. Seham Aff'd, ¶ 27:

> [T]he Company was obliged to see what measures could be taken to protect itself against the Union's threats. One step it took early on, was the implementation of a proposal to eliminate from the contract paragraphs [which] imposed [ ] compulsory Union membership obligations. . . . The Company issued a memo responding to inquiries from the employees as to how they might resign from the Union.

The Court in *Trans World Airlines, Inc. v. Independent Federation of Flight Attendants*, 489 U.S. 426, 440, 109 S.Ct. 1225, 1234, 103 L.Ed.2d 456 (1989), stated that 45 U.S.C. § 152 Third and Fourth address primarily "precertification rights and freedoms of unorganized employees." Judicial intervention in post-certification disputes (as in this case), is only available in limited circumstances where,

---

**21.** On December 15, 1993, Varig posted a notice for its employees which stated, in part, that "[t]he basic rule which you must understand is that you may lose your job if a permanent replacement is picked to fill your job position [if you don't cross the picket line]." Roach Decl., Ex. A.

it is clear that the employer's conduct has "been motivated by anti-union animus or ... an attempt to interfere with its employees' choice of their collective bargaining representatives," *Tello v. Soo Line R.R.*, 772 F.2d 458, 462 (8th Cir.1985), or constitutes "discrimination or coercion" against that representative, *International Brotherhood of Teamsters v. Pan American World Airways*, 607 F.Supp. 609, 614 n. 5 (E.D.N.Y.1985) or involves "acts of intimidation [which] cannot be remedied by administrative means," *Local Union 808 v. P & W Railroad Co.*, 576 F.Supp. 693, 703 (D.Conn.1983).

*Independent Union of Flight Attendants v. Pan American World Airways, Inc.*, 789 F.2d 139, 142 (2d Cir.1986). "Judicial intervention would also be permitted under [§ 152] Third and Fourth if the employer engaged in 'a fundamental attack on the collective bargaining process,' or a 'direct attempt to destroy a union.'" *National R.R. Passenger Corp. v. International Assoc. of Machinists and Aerospace Workers*, 915 F.2d 43, 51 (1st Cir.1990).

Summary judgment is appropriate in this case because Varig's December 24, 1993 notice only informed its employees of their right to resign from the Union; there is nothing in that document which could reasonably be construed as an act of intimidation designed to either interfere with the employees' union representatives or encourage the employees to resign from their union. Decisions by the National Labor Relations Board (the "Board") have also made it clear that by merely providing union members with information on how to resign, a company does not violate Section 8(a)(1) and (3) of the NLRA.[22] For example, in *Chicago Beef Company*, 298 N.L.R.B. 1039, 1990 WL 122480 (1990), the Board held that it was not the dissemination of resignation forms which violated the NLRA; rather, it was the further act of conditioning reinstatement on resignation

from the union which constituted an unfair labor practice. The Board wrote,

In so finding, we, like the judge, rely on *Manhattan Hospital*, 280 N.L.R.B. 113, 114 [1986 WL 53984] (1986), *enf'd mem.* 814 F.2d 653 (2d Cir.1987), *cert. denied*, 483 U.S. 1021 [107 S.Ct. 3265, 97 L.Ed.2d 764] (1987), in which the Board held that *it is unlawful to go beyond merely providing employees with information on how to resign from the union* by attempting to "ascertain whether employees will avail themselves of this right ... offer[ing] any assistance, or otherwise creat[ing] a situation where employees would tend to feel peril in refraining from such revocation" (quoting *R.L. White Co.*, 262 N.L.R.B. 575, 576, 1982 WL 31820 (1982)).

*Id.* at *5 n. 5 (emphasis added). In this case, the notice at issue did not go beyond providing employees with "information on how to resign from the union"; it simply states that "[i]f you want to terminate any further union obligation, you may also want to send a letter of resignation." Significantly, the notice also made clear that "[t]he decision to take any of these steps is entirely up to you and will not be the basis of any form of retribution by the Company against you." The notice is clear on its face and no reasonable jury could interpret it as a threat to those Union employees who wished to remain in the Union.

Because the notice specifically leaves the decision up to the employee and affirmatively states that the employee's decision cannot be held against him, the notice did not, as a matter of law, "create a situation where employees would tend to feel peril in refraining from such revocation." *Id.* In support of its third cause of action the Union relies on *International Association of Machinists and Aerospace Workers, AFL–CIO v. Continental Airlines, Inc.*, 754 F.Supp. 892 (D.D.C.1990), but it is inapposite. In *Continental Airlines*, the court concluded that a poll issued by the Company "had the potential for coercing pro–IAM employees into casting ballots in a phony election for fear of otherwise giving

---

**22.** This statute provides, in relevant part, that, "[i]t shall be an unfair labor practice for an employer— ... (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title ... (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization[.]" 29 U.S.C. § 158(a)(1) and (3).

Continental ammunition in its fight to decertify IAM." *Id.* at 896. In this case, there is nothing in the Company's December 24, 1993 notice which has a potential for coercing pro-Union employees from resigning from the Union; as noted above, the notice specifically states that no retaliation will result from an employee's decision vis-a-vis Union membership. Because the notice is an information-providing device only, it did not "interfere in any way with the organization of [Varig's] employees ... or ... influence or coerce [them] ... not to join or remain members of [the union]." 45 U.S.C. § 152 Fourth.[23] Summary dismissal of this cause of action is therefore appropriate.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment dismissing the first, second, and third causes of action, is granted.

SO ORDERED.

---

**23.** In this regard, the court has disregarded the statement in the Roach declaration that "[f]rom my conversations with Varig reservation employees, I know that some employees interpreted this posting to mean that if they stayed home in the event of a strike they would be 'fired[,]' " (Roach Decl., ¶ 29), which is hearsay and therefore not admissible pursuant to Federal Rule of Civil Procedure 56(e). However, even if this statement is accepted, it would not alter the court's analysis: The notice is clear on its face and simply provides Union members with information on how to resign from the Union *if they want to.* It does not, therefore, violate the RLA's prohibition against coercing employees into leaving their union.